# THE CONQUEROR.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND
CIRCUIT.

No. 98.   Argued January 6, 7, 1897. — Decided March 8, 1897.

So long as the transcript of the record in the Circuit Court is in the Circuit
Court of Appeals, the fact that a mandate from it has gone down to the
Circuit Court, affirming its decree, does not affect the right of this court
to issue a writ of certiorari to the Court of Appeals, to bring the record
here.

An application for a writ of certiorari to bring here for review a record
and judgment entered after the final adjournment of this court, made at
the next term and within a year after the original decree, is made within
time.

A foreign built vessel, purchased by a citizen of the United States, and
brought into the waters thereof, is not taxable under the tariff laws of
the United States.

Rev. Stat. § 970, which provides that " when, in any prosecution commenced
on account of the seizure of any vessel, goods, wares or merchandise,
made by any collector or other officer, under any act of Congress author-
izing such seizure, judgment is rendered for the claimant, but it appears
to the court that there was reasonable cause of seizure, the court shall
cause a proper certificate thereof to be entered, and the claimant shall
not, in such case, be entitled to costs, nor shall the person who made the
seizure, nor the prosecutor, be liable to suit or judgment on account of
such suit or prosecution: *provided*, That the vessel, goods, wares or·
merchandise be, after judgment, forthwith returned to such claimant
or his agent," only affords the collector immunity against a judgment for
damages in cases where proceedings against the vessel were instituted
upon information filed by the United States, for a fine or forfeiture in-
curred by the vessel itself.

A collector of customs who seizes a foreign built vessel purchased by a
citizen of the United States and brought by him into their waters, and
holds the same on the claim that it is taxable for duties under the tariff
laws, is not protected against a judgment for damages, by a certificate
of probable cause.

Demurrage is a proper element of damages, but it can only be allowed
when profits have either actually been lost, or may be reasonably sup-
posed to have been lost, and their amount is proven with reasonable
certainty.

The best evidence of damage suffered by detention is the sum for which
vessels of the same size and class can be chartered in the market; but-

in the absence of such market value, the value of her use to her owner in the business in which she was engaged at the time of the collision is a proper basis for estimating damages for detention, and the books of the owner showing her earnings about the time of her collision are competent evidence of her probable earnings during the time of her detention.

Testimony as to value may be properly received from witnesses who are duly qualified as experts, but the jury, even if such testimony be uncontradicted, may exercise their independent judgment; and there is no rule of law which requires them to surrender their judgment, or to give a controlling influence to the opinions of scientific witnesses.

The testimony in this case falls far short of establishing such a case of loss of profits as entitles the claimant to recover the large sum awarded to him for the detention of his yacht.

Whether the other charges were proper or not, was a matter for the courts below to determine, in the exercise of their best judgment; and, as the commissioner found that they were proper, and as both the District Court and the Court of Appeals affirmed his action in that regard, this court is not disposed to disturb their finding, although the amount seems large.

THIS was a libel by Frederick W. Vanderbilt to recover possession of the steam yacht Conqueror, of which he was the owner, and which was alleged to be illegally detained by J. Sloat Fassett, then collector of customs for the District of New York.

The material facts of the case are as follows: In May, 1891, Vanderbilt, who is a native-born American citizen, purchased of one Bailey, of Kingston-upon-Hull, England, the yacht Conqueror, a foreign built vessel, for the sum of £15,500, or about $75,000. The bill of sale was certified by the United States consul at Liverpool, and the yacht was delivered to Vanderbilt at Hull. The vessel was designed for pleasure only, and has never been put to any other use. After a cruise to Norway, Mr. Vanderbilt returned with her to England, and in June was elected a member of the "Royal Mersey Yacht Club" of Liverpool, thereby, it seems, obtaining the right to fly the blue ensign of Her Majesty's fleet. He never did, however, fly a British flag, but always carried the ensign of the New York Yacht Club, and her enrolment in the Liverpool Yacht Club seems to have been with the intent of claiming a special privilege of exemption from tonnage tax under Rev.

Stat. § 4216, accorded to yachts belonging to foreign yacht clubs.

Shortly after this, the yacht crossed the ocean, and arrived at New York about July 6, 1891, where she was duly entered as a vessel with the collector of the port, and paid the light money levied upon her by the collector as a vessel, pursuant to Rev. Stat. § 4225. She also received from the deputy collector a certificate to her bill of sale, describing her, stating that she had been sold by Bailey to Vanderbilt, and that the latter was a citizen of the United States. This entitled her to protection as an American vessel, but did not authorize her to engage in commerce. After cruising for some time about the coast, on August 27, 1891, in obedience to instructions from the Treasury Department, founded upon an opinion of the Solicitor of the Treasury, that the yacht should be regarded as a dutiable importation, the collector took forcible possession of her, and held her until dispossessed by the marshal under authority of the District Court. On October 1, Mr. Fassett went out of office, and was succeeded by Francis Hendricks, to whom the possession passed.

Meanwhile, on September 1, Mr. Vanderbilt filed his present libel for possession of the yacht, alleging his citizenship; the fact that the vessel was designed, intended and constructed as a pleasure yacht only; its purchase by the libellant, as well as other facts hereinbefore set forth, and prayed for process against the vessel, and for a decree awarding him possession and condemning Fassett in damages and costs. Process having been issued against the yacht, the execution thereof by the marshal was restricted by the customs officials, and it was not until an *alias* and *pluries* process had been issued that the marshal succeeded in obtaining exclusive and undisputed control of her. Fassett then applied to this court for a writ of prohibition, which was denied. *In re Fassett*, 142 U. S. 479.

Answers having been filed by Mr. Fassett, as late collector and personally, and by Mr. Hendricks, as collector, praying for the dismissal of the libel and for a decree of restitution of the yacht to the collector, the cause came on for a hearing in

the District Court, and resulted in a decree of restitution, 47 Fed. Rep. 99, a reference to a commissioner for an assessment of damages, and a subsequent decree for damages in the sum of $15,000 as demurrage for detention of the yacht from August 27 to February 3, and for other items sufficient to make up a total decree of $21,742.34.

Upon appeal to the Circuit Court of Appeals this decree was affirmed without an opinion, whereupon appellant applied for and was granted the present writ of certiorari.

*Mr. Assistant Attorney General Whitney* for appellants.

*Mr. Elihu Root* for appellee. *Mr. S. B. Clarke* and *Mr. Bronson Winthrop* were on his brief.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

Two questions are involved in the merits of this case : *First,* whether this vessel was taxable under the tariff laws ; *second,* whether the award of damages was justified by the law and the testimony.

1. A preliminary objection is made, however, by the appellee that the case is not properly before the court, because the mandate is not here, and because the case was in the District Court and was brought here by a writ addressed to a court which had lost jurisdiction of it before the writ had issued.

The fact that the mandate of the Circuit Court of Appeals to the District Court, affirming the decree of that court, had gone down, is immaterial. The transcript of the record is still in the Court of Appeals, and if a writ of certiorari can be issued at all after a final disposition of the case in that court, it could not be defeated by the issue of a mandate to the court below. That certiorari can issue, and, indeed, is ordinarily only issued, after a final decree in the Court of Appeals, was settled by this court in the *American Construction Co.* v. *Jacksonville, Tampa & Key West Railway,* 148 U. S. 372, 384, although it may be issued before, if this

court be of opinion that the facts of the case require an earlier interposition. *The Three Friends, ante*, 1.

The only question worthy of consideration in this connection is whether the writ of certiorari should not have been applied for more promptly. The decree sought to be reviewed was entered June 6, 1893; the petition for certiorari was not filed until April 16, 1894. The act does not fix the time within which application for a certiorari must be made. As the decree was entered June 6, immediately after this court had adjourned for the term, and as the application must be made to the court while in session, no fault is imputable to the Government in not making the application before the opening of the next term in October; and while we think such application should be made with reasonable promptness, as it was made during the term and within a year after the original decree, we think it was within the time. We do not think the party complaining is limited to the six months allowed by section eleven of the Court of Appeals act for suing out a writ of error from the Court of Appeals to review the judgment of the District or Circuit Court; and it would seem that he is, by analogy, entitled to the year within which, by section six, an appeal shall be taken or writ of error sued out from this court to review judgments or decrees of the Court of Appeals in cases where the losing party is entitled to such review.

2. Was The Conqueror dutiable under the tariff act of October 1, 1890? 26 Stat. 567. This act requires duties to be levied upon all "articles" imported from foreign countries and mentioned in schedules therein contained, none of which schedules mention ships or vessels *eo nomine*. An abstract furnished us of the corresponding clauses in all the principal tariff acts from 1789 to the present date shows that duties are laid either upon "articles," as in the present act, or upon "goods, wares and merchandise"—words which have a similar meaning. Indeed, the words "articles" and "goods, wares and merchandise" seem to be used indiscriminately, and without any apparent purpose of distinguishing between them. While a vessel is an article of personal property, and may be

termed " goods, wares and merchandise," as distinguished from real estate, it is not within either class, as the words are ordinarily used. In all this class of cases, the meaning of the words, as used in the particular statute, must be gathered from the context and from the evident purpose of the act. Thus, in *Palmer's Ship Building and Iron Co.* v. *Claytor*, L. R. 4 Q. B. 209, it was held that a ship was not an "article" within the meaning of an act forbidding the employment of children to labor in the manufacture of articles, or parts of articles; but that an iron plate was an article of metal, even though used in shipbuilding, and the shaping of the plate was part of the manufacture.

Vessels certainly have not been treated as dutiable articles, but rather as the vehicles of such articles, and though foreign built and foreign owned, are never charged with duties when entering our ports, though every article upon them, that is not a part of the vessel or of its equipment or provisions, is subject to duty, unless expressly exempted by law. If this yacht had been brought here by a foreigner, it is not insisted that she would have been subject to duty. Indeed, she might be navigated between our ports for an unlimited time, provided only that she did not carry passengers or goods for hire. If she be dutiable at all, it must then be because she was bought by an American citizen. But why should this make her dutiable? She is not imported or taken into the country in the ordinary sense in which that term is used with reference to other articles, does not become commingled with the general mass of property, and is employed precisely as she might be legally employed by her foreign owners, or by an American citizen leasing her from such owner. Other articles are dutiable, not because they have been purchased, but because they are actually imported and become the subject of sale and commerce within the country. But if a yacht be dutiable when purchased, and only when purchased by an American citizen, we apply a test of dutiability that we apply to no other article, namely, the test of ownership.

Not only is there no mention of vessels, *eo nomine*, in the tariff acts, but there is no general description under which they

could be included except as manufactures of iron or wood.
But it is only by straining the word far beyond its ordinary
import, that we are able to apply the word "manufacture" to
a seagoing, schooner-rigged, screw steamship, 182½ feet long,
nearly 25 feet wide, and of 372 tons burden. The term "manu-
facture" is as inapplicable to such a vessel as it would be to a
block of brick or stone, erected in the heart of a great city.
A ship is doubtless constructed of manufactured articles which,
if imported separately, would be the subject of duty, but which
put together in the form of a ship are taken out of the class
of "manufactures," and become a vehicle for the importation
of other articles. Considering the hundreds of foreign vessels
which enter the ports of the United States every day, it is
incredible that, if Congress had intended to include them in
the tariff acts, it would not have made mention of them in
terms more definite than that of "manufactures."

While there has been no direct adjudication upon the ques-
tion of the taxability of foreign vessels under the tariff laws,
it was held in *United States* v. *A Chain Cable*, 2 Sumn. 362,
that a chain cable was not taxable, which was purchased at
Liverpool by the master of the ship Marathon to supply the
place of a hempen cable which had become unseaworthy before
the arrival of the ship at Liverpool, if the cable were purchased
*bona fide* with the intention of using it for that ship, and not
to sell as merchandise. It was said by Mr. Justice Story that
the words "goods, wares and merchandise," used in the tariff
act, included only such as were designed for sale, or to be
applied to some use or object distinct from their *bona fide*
appropriation to the use of the ship in which they are im-
ported. And in *The Gertrude*, 2 Ware, 181; *S. C.* 3 Story,
68, it was held that the tackle, apparel and furniture of a
foreign vessel, wrecked upon our coast, and landed and sold
separately from the hull, were not goods, wares and merchan-
dise imported into the United States within the meaning of
the revenue laws. The opinion was delivered by Judge Ware,
briefly affirmed on appeal to the Circuit Court by Mr. Justice
Story, and the case put upon the ground that the rigging and
apparel of the ship are a part of the ship, and therefore not

merchandise in any other sense of the word than that in which the ship herself is. "If," said he, "we look through the whole of the numerous acts of Congress laying duties on merchandise imported, as well as those regulating the collection of the same, we shall find they uniformly contemplate the cargo; they refer to articles having the quality of merchandise in the ordinary and most popular sense of the word. They refer also to goods intended to be introduced into the country for sale and consumption, or for the general purposes of commerce."

While neither of these cases is directly in point, each of them would probably have been differently decided, if the court had been of opinion that a foreign vessel arriving in this country and sold here, was the subject of duty.

The fact that, in a particular case, such as that of The Geneva, 20 Stat. 473, Congress may have seen fit to impose duties as a condition to the granting of an American registry to a foreign built steamboat, is fully met by a very large number of similar cases, in which no such requirement is made. In the following, taken from a single volume, 28 Stat., it appears that foreign built vessels were admitted to registry or nationalized without any such requirement: The Oneida, p. 43; The Goldsworthy, p. 216; The Astoria, p. 217; The Oceano, p. 219; The S. Oteri, p. 277; The Skudesnaes, p. 508; The Claribel and Athos, p. 625; The Empress, p. 626; The Linda and The Archer, p. 626; The James H. Hamlen, p. 643. Doubtless an examination would reveal an equally large number in other volumes. In fact the case of The Geneva seems to have been wholly exceptional. As bearing upon this, by the act of December 23, 1852, c. 4, 10 Stat. 149, reproduced in Rev. Stat. § 4136, the Secretary of the Treasury is authorized to "issue a register or enrolment for any vessel built in a foreign country, whenever such vessel shall be wrecked in the United States, and shall be purchased and repaired by a citizen of the United States, if it shall be proved to the satisfaction of the Secretary that the repairs put upon such vessel are equal to three fourths of the cost of the vessel when so repaired."

We do not undertake to say that the same rule applies to canoes, small boats, launches and other undocumented vessels,

which are not used, or are not capable of being used, as a means of transportation on water, as the word "vessel" is defined in Rev. Stat. § 3. While these vessels have a limited capacity for transportation, they are ordinarily used for purposes of pleasure, and are not considered of sufficient importance to require them to be entered at the custom house, or to be entitled to the special protection of the flag. They are treated like other similar vehicles used upon land, and there are reasons for saying that these boats, which do not ordinarily come of themselves into the country, but are imported or brought upon the decks of other vessels, are mere manufactures or other "articles," and are within the description of the tariff acts.

But the decisive objection to the taxability of vessels as imports is found in the fact that, from the foundation of the Government, vessels have been treated as *sui generis*, and subject to an entirely different set of laws and regulations from those applied to imported articles. By the very first act passed by Congress in 1789, subsequent to an act for administering oaths to its own members, a duty was laid upon "goods, wares and merchandise," imported into the United States, in which no mention whatever is made of ships or vessels; but by the next act, entitled "An act imposing duties on tonnage," a duty was imposed "on all ships or vessels entered in the United States" at the rate of six cents per ton upon all such as were built within the United States, and belonged to American citizens; of thirty cents per ton upon all such as should thereafter be built within the United States, belonging to subjects of foreign powers, and of fifty cents per ton upon all other ships or vessels, with a proviso that no American ship or vessel employed in the coasting trade or fisheries should pay tonnage more than once in any year. This distinction between "goods, wares and merchandise," and "ships or vessels," has been maintained ever since, although the amount of such duties has been repeatedly and sometimes radically changed. At the time of the arrival of The Conqueror, tonnage duties were imposed under the act of June 26, 1884, as amended by section eleven of the act of June 19, 1886, with a proviso that the

President of the United States might suspend the collection of them in certain specified cases. In addition thereto there was, by Rev. Stat. § 4225, a duty of fifty cents per ton, denominated "light money," levied and collected on all vessels not of the United States which might enter the ports of the United States; although, by § 4226, there was a provision that this tax should not be imposed upon any unregistered vessel "owned by citizens of the United States, and carrying a sea letter, or other regular document, issued from a custom house of the United States, proving the vessel to be American property." It would seem that, under this section and in virtue of the collector's certificate to her bill of sale, stating that her owner was an American citizen, The Conqueror would not thereafter be subject to the payment of light money. *The Miranda*, 1 U. S. App. 228.

There is no provision of law preventing foreign built vessels from being purchased, owned and navigated by citizens of the United States, although they are not entitled to registry, or to enrolment and license as American vessels, because not built in the United States. §§ 4132, 4311, 4312.

The privilege, however, of owning foreign vessels is usually of comparatively little value, since in order to carry on a foreign trade, the coasting trade or the fisheries, they must be entitled either to registry, or to enrolment and license, a privilege, as above stated, not granted to foreign built vessels though owned by American citizens. Rev. Stat. §§ 2497, 4131, 4311; *The Merritt*, 17 Wall. 582.

The privilege, then, of owning foreign built vessels, and of navigating them under the protection of the American flag, is practically confined to vessels used for the purposes of pleasure, which is probably the reason why the question presented in this case has never arisen before, since the only way in which foreign built vessels can be made available as American vessels, for purposes of trade and commerce, is by a special act of Congress permitting them to be registered or enrolled as American vessels.

A special provision is made for yachts by Rev. Stat. § 4214, as amended by the act of March 3, 1883, c. 133, 22 Stat. 566,

under which " the Secretary of the Treasury may cause yachts
used and employed exclusively as pleasure vessels or designed
as models of naval architecture,  .   .   .   to be licensed on terms
which will authorize them to proceed from port to port of the
United States, and by sea to foreign ports, without entering
or clearing at the custom house."   By § 4216, "yachts, be-
longing to a · regularly organized yacht club of any foreign
nation which shall extend like privileges to the yachts of the
United States, shall have the privilege of entering or leaving
any port of the United States without entering or clearing at
the custom house thereof, or paying· tonnage tax."   It was
probably under this section, and for the purpose of exempting
her from payment of a tonnage tax, that Mr. Vanderbilt had
The Conqueror enrolled as a member of the Royal Mersey Yacht
Club, although it may be open to question whether this sec-
tion was not intended as a mere reciprocity of courtesy, or has
any application to foreign built yachts belonging to American
citizens.   Certainly no such question can arise since the pas-
sage of the act of January 25, 1897 — not yet officially pub-
lished — by the first section of which Rev. Stat. § 4216 is
reënacted, with a proviso " that the privileges of this section
shall not extend to any yacht built outside of the United States,
and owned, chartered or used by a citizen of the United States,
unless such ownership or charter was acquired prior to the
passage of this act."   By the second section of the same act
it is further provided that the previous act of June 19, 1886,
exempting yachts from tonnage taxes, is repealed, " so far as
the same exempts any yacht built outside of the United States,
and owned, chartered or used by a citizen of the United States."

It is worthy of notice in this connection that this act, which
was evidently passed with reference to this case or this class
of cases, and for the express purpose of subjecting foreign
built yachts hereafter purchased or chartered by American
citizens to tonnage fees, makes no mention whatever of duties.
It is scarcely possible that, if Congress had chosen to impose
duties upon such yachts, or had supposed them subject to duty
as imported articles, it would have also discriminated against
them by requiring them to pay tonnage fees.   In this, the

latest expression of the legislative will, Congress seems to have recognized the theory, which we have already gathered from the prior course of legislation, that vessels should be treated as a class by themselves, and not within the general scope of the tariff acts.

In view of the elaborate opinion of the District Judge upon this branch of the case it is unnecessary to extend this discussion farther. We think that the liability of ships and vessels to tonnage dues and to light money, except where a certain class of vessels is specially exempted, shows that it was not the intention of Congress to treat them as dutiable articles. So far as the court below awarded restitution of the vessel to the libellant, its decree was right and will be affirmed.

3. The question of damages remains to be considered. Upon the rendition of the decree, the court granted the usual certificate that the collector acted " therein under direction of the Secretary of the Treasury, and there was probable cause for said acts done by him." The certificate was made upon application of the collector, and was not opposed by the libellant who, however, reserved the right to move to vacate the same in case the judgment was not paid out of the Treasury within a reasonable time. This certificate was granted pursuant to Rev. Stat. § 970, which provides that " when, in any prosecution commenced on account of the seizure of any vessel, goods, wares or merchandise, made by any collector or other officer, under any act of Congress authorizing such seizure, judgment is rendered for the claimant, but it appears to the court that there was reasonable cause of seizure, the court shall cause a proper certificate thereof to be entered, and the claimant shall not, in such case, be entitled to costs, nor shall the person who made the seizure, nor the prosecutor, be liable to suit or judgment on account of such suit or prosecution : *Provided*, That the vessel, goods, wares or merchandise be, after judgment, forthwith returned to such claimant or his agent."

This section is claimed by the Government to afford the collector complete immunity against any judgment for damages. Its language, broadly construed, might justify this position, although the fact that the certificate is only author-

ized when judgment is rendered for the *claimant* would indicate that it was properly applicable only in cases where proceedings against the vessel were instituted, upon information filed by the United States, for a fine or forfeiture incurred by the vessel itself. This construction is also supported by the final words of the section, declaring that neither the person who made the seizure, nor the prosecutor, shall be liable to suit or judgment on account of such suit or prosecution, and that the vessel shall be forthwith returned to the *claimant.* The word "claimant" in all admiralty proceedings *in rem* is used to denote the person who makes claim to the property seized as the owner thereof, and by virtue of such ownership, or other interest therein, is admitted to defend the suit. Gen. Adm. Rule 26. In a broader sense, however, it might be used to designate the owner of property, whether prosecuting or defending his right to such property, though this does not agree with the ordinary legal meaning of the word "claimant."

But if it were conceded that the statute be somewhat ambiguous, we are authorized to refer to the original statutes, from which the section was taken, and to ascertain from their language and context to what class of cases the provision was intended to apply. *United States* v. *Bowen,* 100 U. S. 508; *Myer* v. *Car Company,* 102 U. S. 1, 11; *United States* v. *Lacher,* 134 U. S. 624. The protection of the collector by a certificate of probable cause appears first in the act of July 31, 1789, c. 5, § 36, 1 Stat. 29, 47, to regulate the collection of duties upon the tonnage of ships, and upon goods, wares and merchandise imported. The act is not a tariff act imposing duties and tonnage, but is one for the administration of the tariff laws, and the collection of duties. By this act the country was divided into collection districts, ports of entry and delivery established, the duties of the collector and other customs officers defined, the obligation of vessels arriving with cargoes laid down, and the method of collecting such duties prescribed with certain penalties for the non-performance of its provisions. By section 36 " all penalties accruing by any breach of this act shall be sued for and recovered with costs

of suit, in the name of the United States, . . . by the collector of the district, . . . and such collector shall be, and hereby is authorized and directed to sue for and prosecute the same to effect." 'The section then provides for the manner of prosecuting for a forfeiture; how *claim* shall be made for the property seized, and under what circumstances it shall be delivered to the *claimant*. The section terminates with a provision for a certificate of probable cause, if judgment shall be given for the *claimant or claimants*. Through this entire section the word "claimant" is obviously used in its technical sense, to stand for the owner of the property seized for a penalty or forfeiture, under previous sections of the act. Indeed, the act is so clear in this particular, that scarcely any room is left for any other construction. This act was repealed by the act of August 4, 1790, c. 35, 1 Stat. 145, to provide more effectually for the collection of the duties on goods imported and upon tonnage. The later act is practically a reënactment of the former, with many amendments and enlargements of its scope, and in section 67, section 36 of the prior act is repeated, with the same provision for a certificate of probable cause. The act of 1790, however, was repealed March 2, 1799, c. 22, 1 Stat. 627, by a further act "to regulate the collection of duties on imports and tonnage," wherein the whole subject was again reconsidered, and a new act, still further amending and enlarging the prior ones, adopted. Section 89 of this act again repeated the provision for a certificate of probable cause. These acts limited the granting of such certificates to seizures made for fines or forfeitures under the provisions of the particular act. Subsequently, however, other acts were passed authorizing seizures of vessels and goods for other offences; but in none of these acts was protection given to the officer making the seizure with probable cause. Act of December 31, 1792, § 4, 1 Stat. 287, 289; Act of September 1, 1789, c. 11, § 29, 1 Stat. 55, 63; Act of June 5, 1794, c. 50, 1 Stat. 381; Act of April 18, 1806, c. 29, 2 Stat. 379. To extend to the collector the protection of a certificate of probable cause, where forfeitures were incurred under these acts, a short act was passed on February 24, 1807,

2 Stat. 422, c. 19, permitting the court to grant such certificate, wherever a seizure was made by any collector, or other officer, under *any* act of Congress authorizing such seizure. This act was substantially reënacted in Rev. Stat. § 970.

We think this legislation, however, was intended to be confined to cases where the collector makes a seizure, followed by a suit or prosecution in the name of the United States for a penalty or forfeiture arising from an illegal act of the persons in charge of the vessel, and was not intended to be applied where a vessel is simply detained under § 2964 for a non-payment of duties. As was observed in *In re Fassett*, 142 U. S. 485 : "Section 2964 provides that in all cases of failure or neglect to pay the duties within the period allowed by law to the importer to make entry thereof, the merchandise shall be taken possession of by the collector and deposited in the public stores, there to be kept, subject at all times to the order of the importer, on payment of the proper duties and expenses. Section 2973 provides that, if the merchandise shall remain in public store beyond one year, without payment of the duties and charges thereon, it is then to be appraised and sold by the collector at public auction, and the proceeds, after deducting for storage and other charges and expenses, including duties, are to be paid over to the importer." Of course, the yacht Conqueror was not such an article as could have been deposited in public stores within the language of the section, but if it had been subject to duty at all, the collector could not be considered in default for having detained her in the manner he did for its payment. His seizure, however, is not such a one as is contemplated by the above statutes concerning certificates of probable cause.

The case, instead of being covered by Rev. Stat. § 970, seems more properly to fall within the provisions of section 989, by which "when a recovery is had in any suit or proceeding against a collector . . . for any act done by him, . . . in the performance of his official duty, and the court certifies that there was probable cause, . . . or that he acted under the directions of the Secretary of the Treasury, . . . no execution shall issue against such col-

lector or other officer, but the amount so recovered shall, upon final judgment, be provided for and paid out of the proper appropriation from the Treasury." Upon the whole, we are of opinion that the collector was not protected by the certificate of probable cause from a judgment for damages.

4. The main question in this case turns upon the proper measure of damages. In the amount of $21,742.24, awarded by the final decree of the District Court, was included the sum of $15,000, " for loss of use of boat while detained by the respondent, from August 27, 1891, to February 3, 1892, at $100 per day." This is the principal item of damage to which objection is made in this court.

That the loss of profits or of the use of a vessel pending repairs or other detention, arising from a collision, or other maritime tort, and commonly spoken of as demurrage, is a proper element of damage, is too well settled both in England and America to be open to question. It is equally well settled, however, that demurrage will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable certainty. In one of the earliest English cases upon this subject, *The Clarence*, 3 W. Rob. 283, it was said by Dr. Lushington that " in order to entitle a party to be indemnified for what is termed in this court a consequential loss, being for the detention of his vessel, two things are absolutely necessary — actual loss, and reasonable proof of the amount. . . . It does not follow, as a matter of necessity, that anything is due for the detention of a vessel whilst under repair. Under some circumstances, undoubtedly such a consequence will follow, as, for example, where a fishing voyage is lost, or where the vessel would have been beneficially employed." To same effect are *The Black Prince*, Lush. 568; *The City of Peking*, 15 App. Cas. 438; *The Argentino*, 14 App. Cas. 519.

The first case in which demurrage was allowed by this court for the detention of a ship under a libel for tortious seizure was that of *The Apollon*, 9 Wheat. 362, which was a suit brought by the master of a French ship against the

collector of St. Mary's for damages occasioned by an illegal seizure of the ship and cargo while lying within the territories of the King of Spain. In this case demurrage was allowed at the rate of $40 per day, although the court had expressed its opinion that the probable profits of a voyage, either upon the ship or cargo, could not furnish any just basis for the compensation of damages, the court observing that " every other method of adjusting compensation," than that of demurrage, " would be merely speculative, and liable to the greatest uncertainties."

*Smith* v. *Condry*, 1 How. 28, was a common law case, wherein a vessel, laden with a cargo of salt, received injury by a collision in the port of Liverpool. Upon the trial, plaintiffs offered to prove that if the ship had been able to sail upon her voyage upon the day named, she would in due course have arrived in Georgetown in time for the sale of her cargo in the fishing season of the Potomac River, when there was a great demand for salt; but, owing to the delay, she did not arrive until the season was over, and thereby lost ten cents per bushel upon the value of the salt. The court, acting upon the analogy of insurance cases, held that this testimony was properly refused admission. It is quite obvious, however, that this was not a case where damages were claimed for the use of the vessel pending her repairs, but for the loss of anticipated profits pending the sale of her cargo, and therefore falling within the rule stated in *The Apollon*, that profits upon the sale of the cargo are excluded. There is no conflict between this case and that of *Williamson* v. *Barrett*, 13 How. 101, wherein the court held upon the authority of *The Gazelle*, 2 W. Rob. 279, that the plaintiffs were entitled to recover for the use of their boat, by which " we understand what she would have produced to the plaintiffs by the hiring or chartering of her to run upon the river in the business in which she had been usually engaged"; in other words, the market price of the hire of the vessel. This ruling has been repeatedly affirmed in this court, *The Potomac*, 105 U. S. 630; in England, *The Betsey Caines*, 2 Haggard, 28; *The Inflexible*, Swabey, 200; *The Star of India*, 1

P. D. 466; *The City of Buenos Ayres*, 1 Asp. Mar. L. C. 169; and in France, *Sibille*, De l'Abordage, sec. 411; *De Fresquet*, Des Abordages, pp. 48, 49; *Caumont*, Dict. Mar. Title Abordage, sec. 224.

The difficulty is in determining when the vessel has lost profits and the amount thereof. The best evidence of damage suffered by detention is the sum for which vessels of the same size and class can be chartered in the market. Obviously, however, this criterion cannot be often applied, as it is only in the larger ports that there can be said to be a market price for the use of vessels, particularly if there be any peculiarity in their construction which limits their employment to a single purpose.

In the absence of such market value, the value of her use to her owner in the business in which she was engaged at the time of the collision is a proper basis for estimating damages for detention, and the books of the owner showing her earnings about the time of her collision are competent evidence of her probable earnings during the time of her detention. *The Mayflower*, Brown's Adm. 376; *The Transit*, 4 Ben. 138; *The Emilie*, 4 Ben. 235.

The mere opinion of witnesses, unfortified by any data, as to what the earnings would probably have been, is usually regarded as too uncertain and conjectural to form a proper basis for estimation, though in a few cases they seem to have been received. The damages must not be merely speculative, and something else must be shown than the simple fact that the vessel was laid up for repairs. Thus, if a vessel employed upon the lakes should receive damages by collision, occurring just before the close of navigation, and she were repaired during the winter, no demurrage could be allowed, since no vessel upon the lakes can earn freight during the winter. *The Thomas Kiley*, 3 Ben. 228.

In *The R. L. Maybey*, 4 Blatchford, 439, 440, it was said by Mr. Justice Nelson upon the subject of damages that "a good deal of the testimony was general, and turned upon mere opinion as to the probability of employment in the towing business and the amount of the earnings, if employed. This

kind of proof is too speculative and contingent to be the foundation of any rule of damages. It is at best but conjecture." On appeal to this court the decree was affirmed, *Sturgis* v. *Clough*, 1 Wall. 269, Mr. Justice Grier observing that "the charge for demurrage allowed by him" (the commissioner) " was not justified by the evidence, although there was testimony to support it, such as can always be obtained when friendly experts are called to give opinions. Besides, the libellant withheld the best evidence of the profits made by his boat, which would be found in his own books, showing his receipts and expenditures before the collision." The testimony is not set forth in the report of the case, but on referring to the original record we find that it was much stronger in favor of an allowance of demurrage than the testimony in this case. Five witnesses were sworn by the libellant, who testified that there was a demand in the port of New York for the services of steam tug boats, such as the injured vessel was, and that the value of such a boat was about $100 per day. Four witnesses testifying for the claimant did not deny that there was a demand for such vessels, but put the value of her services at a much lower sum. So in the case of *The Isaac Newton*, 4 Blatchford, 21, Mr. Justice Nelson rejected the allowance for demurrage founded simply upon the evidence of the master and the mate, as a matter of opinion, treating the allowance as conjectural and speculative.

In *The Cayuga*, 2 Ben. 125, a ferry boat, injured by a collision, was withdrawn for repairs, her place being supplied by a boat taken from another ferry belonging to the libellants, whose place was in turn supplied by a spare boat. It was not shown that the injured boat could have been chartered for any sum for the time she was laid up, but proof was given as to the value of her use, based upon her receipts while running on the ferry. It was held that a judgment as to her charter value, given by men having experience upon the ferries, founded upon their knowledge of the business, was a proper basis for the allowance of demurrage. This case was affirmed by the Circuit Court, 7 Blatchford, 385, and also

upon further appeal by this court. 14 Wall. 270. Of same purport is *The Favorita*, 18 Wall. 598.

There are two cases reported in which demurrage was allowed for the detention of a yacht. In one of these, *The Walter W. Pharo*, 1 Lowell, 437, the total allowance was but $80; and in the other, *The Lagonda*, 44 Fed. Rep. 367, the yacht had been detained eight days while undergoing repairs, and was allowed by the commissioner $48 as interest upon $36,000, the cost of the yacht. Upon exceptions by the libellant, the court held that the testimony seemed to justify the conclusion that the yacht could have been chartered by her owner for a season of three months for the sum of $6000; that under such a charter the vessel would have earned for her owner in eight days the sum of $552, and gave a decree for that sum.

Upon the other hand, however, in the recent case of *The Emerald*, 1896, P. D. 192, decided by the English Court of Appeals, the question was whether demurrage could be allowed for detention pending the repairs of a vessel (the Greta Holme) used by a body of public trustees for the purpose of dredging and raising wrecks in Liverpool harbor. The court held unanimously that demurrage could not be allowed to the board of trustees, because the vessel was not a source of profit to them. In delivering the opinion Lord Esher observed: (p. 204) "It has been pointed out, and I think quite fairly, that you cannot recover by way of damages on account of something which you call profit, but of which profit there is no evidence. . . . Then they talk of letting her go to Preston, and that the Preston people would have given £100 a week probably. It is all imagination. . . . The dredger is not kept for the purpose of being let to any one else. . . . To say that at some indefinite and future time they could have let her if they had not wanted her is too remote for anybody to act upon in giving them compensation for the loss of the dredger by way of damages. It seems to me that the damages were too shadowy and too remote to be the proper subject-matter of damages in the collision." Lord Justice A. L. Smith said: (p. 206) "It is to be remarked that during all the

time that the dredger was sunk and under repairs the harbor board have not, in fact, lost one penny. . . . I agree with the report of the registrar and merchants upon this point. They say that 'the harbor or conservancy board are clearly not in the position of a trading company which is entitled to claim for loss of profit, and although their dredging operations were no doubt delayed by the disabling of this dredger, it does not appear to us that the plaintiffs have sustained any tangible pecuniary loss.'" Lord Justice Rigby said: (p. 208) "The board attempted to show that in some circumstances they might let this dredger; but the evidence failed to fix any definite time when the board would no longer require to use her. It seems to me that the suggested damage which might be occasioned to the Mersey docks and harbor board was mere speculation."

In the case under consideration, the only evidence of loss of profits was that of three witnesses, one of whom, Samuel Holmes, a steamboat broker, swore that the reasonable value of the use of the yacht was $3000 per month. He gave the only instance of such a charter within his knowledge — the charter of a boat of this size about three or four years before, for about $9000 for a winter trip to the West Indies. "The circumstances were a little different than this though." What those circumstances were, what was the character of the yacht, and how long the duration of the charter, were not stated, and the illustration is of trifling value. The next witness, Hughes, a yacht-broker, stated simply that The Conqueror was worth $100 per day, fortifying his testimony by no fact whatever. The last witness, Thomas Manning, also a yacht-broker, stated the value of The Conqueror from August 27 to February 3 to be about $20,000 for the boat itself without the crew; stating that there was more or less demand for those large boats, but a great difficulty in getting them. Whether the demand at that time was more or less than the average was not stated; nor are any facts given in support of his testimony. The expression is wholly indefinite and unsatisfactory.

Perhaps if this testimony were taken literally, without reading between the lines, considering other facts appearing in the

record, or bringing to bear upon it other considerations which are matters of common knowledge, it might justify the construction placed upon it by the court below, that the libellant had been deprived of the services of a vessel which might possibly have been leased at $100 per day. But this is not the proper view to be taken of this testimony. While there are doubtless authorities holding that a jury (and in this class of cases the court acts as a jury) has no right arbitrarily to ignore or discredit the testimony of unimpeached witnesses so far as they testify to facts, and that a wilful disregard of such testimony will be ground for a new trial, no such obligation attaches to witnesses who testify merely to their opinion; and the jury may deal with it as they please, giving it credence or not as their own experience or general knowledge of the subject may dictate. Indeed, the courts of New Hampshire at one time, and until the rule was changed by the legislature, went so far as to exclude the opinions of witnesses upon questions of value altogether, and irrespective of any question as to their qualifications. *Rochester* v. *Chester*, 3 N. H. 349; *Peterborough* v. *Jaffrey*, 6 N. H. 462; *Beard* v. *Kirk*, 11 N. H. 397; *Robertson* v. *Stark*, 15 N. H. 109; *Low* v. *Connecticut & Passumpsic Railroad*, 45 N. H. 370.

The better opinion, however, is that testimony as to value may be properly received from the mouths of witnesses, who are duly qualified to testify in relation to the subject of inquiry, although the jury, even if such testimony be uncontradicted, may exercise their independent judgment. In *Forsyth* v. *Doolittle*, 120 U. S. 73, which was an action to recover compensation for services rendered by plaintiffs in effecting the sale of certain lands in Indiana, and in various legal proceedings concerning the title, the following instruction to the jury was held to be correct: " You are not bound by the estimate which these witnesses have put upon these services. They are proper to be considered by you, as part of the proof bearing upon the question of value, as the testimony of men experienced in such matters, and whose judgment may aid yours. But it is your duty, after all, to settle and determine this question of value from all the testimony in the case, and to award to

the plaintiffs such amount, by your verdict, as the proof satisfies you is a reasonable compensation for the services which, from the proof, you find plaintiff rendered, after deducting the amount the plaintiffs have already received for such services."

The proper rule upon the subject is nowhere better stated than by Mr. Justice Field in delivering the opinion of the court in *Head* v. *Hargrave*, 105 U. S. 45, which was also an action for professional services as attorneys: "It was the province of the jury to weigh the testimony of the attorneys as to the value of the services, by reference to their nature, the time occupied in their performance, and other attending circumstances, and by applying to it their own experience and knowledge of the character of such services. To direct them to find the value of the services from the testimony of the experts alone was to say to them that the issue should be determined by the opinions of the attorneys, and not by the exercise of their own judgment of the facts on which those opinions were given. The evidence of experts as to the value of professional services does not differ in principle from such evidence as to the value of labor in other departments of business, or as to the value of property. So far from laying aside their own general knowledge and ideas, the jury should have applied that knowledge and those ideas to the matters of fact in evidence in determining the weight to be given to the opinions expressed; and it was only in that way that they could arrive at a just conclusion. While they cannot act in any case upon particular facts material to its disposition resting in their private knowledge, but should be governed by the evidence adduced, they may — and to act intelligently they must — judge of the weight of the force of that evidence by their own general knowledge of the subject of inquiry. . . . Other persons besides professional men have knowledge of the value of professional services; and while great weight should always be given to the opinions of those familiar with the subject, they are not to be blindly received, but are to be intelligently examined by the jury in the light of their own general knowledge; they should control only as they are found to be reasonable."

In short, as stated by a recent writer upon expert testimony, the ultimate weight to be given to the testimony of experts is a question to be determined by the jury; and there is no rule of law which requires them to surrender their judgment, or to give a controlling influence to the opinions of scientific witnesses. Rogers on Expert Testimony, § 207; *St. Louis* v. *Ranken*, 95 Missouri, 189; *Kansas* v. *Butterfield*, 89 Missouri, 648; *Atchison, Topeka &c. Railroad* v. *Thul*, 32 Kansas, 255; *Brehm* v. *Great Western Railroad*, 34 Barb. 256, 272; *Williams* v. *State*, 50 Arkansas, 511, 520; *Humphries* v. *Johnson*, 20 Indiana, 190; *Goodwin* v. *State*, 96 Indiana, 550; *United States* v. *McGlue*, 1 Curtis, 1, 19; *United States* v. *Molloy*, 31 Fed. Rep. 19.

Without imputing to the witnesses, who were sworn in this case upon the subject of damages, any design to mislead the court, we are bound to say that their testimony falls far short of establishing such a case of loss of profits as entitles the libellant to recover this large sum for the detention of his yacht. It is not the mere fact that a vessel is detained that entitles the owner to demurrage. There must be a pecuniary loss, or at least, a reasonable certainty of pecuniary loss, and not a mere inconvenience arising from an inability to use the vessel for the purposes of pleasure, or, as was said by Doctor Lushington in *The Clarence*, 3 W. Rob. 286: "There must be actual loss and reasonable proof of the amount." In other words, there must be a loss of profits in its commercial sense. In all the cases in which we have allowed demurrage the vessel has been engaged, or was capable of being engaged, in a profitable commerce, and the amount allowed was determined either by the charter value of such vessel, or by her actual earnings at about the time of the collision. The Conqueror, however, did not belong to the class of vessels which are engaged in commercial pursuits, or are ordinarily let to hire. There is doubtless a class of pleasure boats that are let for excursions, and become a source of pecuniary profit to their owners; but The Conqueror did not belong to that class. She was purchased by her owner for his personal pleasure, and there is not an atom of testimony tending to show that he

bought her for hire, or would have leased her if he had been able to do so, even for the large sum of $100 per day fixed as her value.

Again; the court may properly take judicial notice of the fact that the yachting season in our northern waters practically comes to an end before the first of November, and, as The Conqueror was seized on August 27, during more than one half the time for which demurrage was allowed she probably would have been laid up at her wharf. It is true there was a possibility that her owner might have desired her for use in a winter's cruise to tropical waters; but there was not the slightest evidence of that, and the contingency of her being so used was too remote to justify an allowance upon that basis.

The amount of demurrage allowed, too, was so great as, if not to shock the conscience, at least to induce the belief that it must have been estimated by witnesses who were most friendly to the owner. The yacht cost originally $75,000. The proposition that her use for a little more than five months, during the autumn and winter, should be worth to her owner $15,000 over and above all her expenses, for which a separate allowance was made, is putting a strain upon our credulity which we find ourselves quite unable to bear. The truth is, that estimates of value made by friendly witnesses, with no practical illustrations to support them, are, as observed by the various courts through which the case of *Sturgis* v. *Clough* passed, too unsafe, as a rule, to be made the basis of a judicial award, unless it be shown with much greater certainty than it is in this case, either that the vessel was earning profits, or that she belonged to a class of vessels for which there was a steady demand in the market. We think the testimony upon the subject of demurrage in this case should have been held to be insufficient.

5. The other items of damage, going to make up the aggregate amount awarded, included about $4500 for the wages and provisions of the crew, and also for wharfage, towage, night watchmen and extra expenses in heating the vessel; all of which are claimed to be unauthorized, in view of the

fact that by Rev. Stat. § 829, the marshal is allowed, "for the necessary expenses of keeping boats, vessels or other property attached or libelled in admiralty, not exceeding two dollars and fifty cents a day." While it is entirely true that the marshal is thus limited, it does not follow that the libellant may not incur a larger expense if, in his opinion, it is necessary for the proper protection of the vessel, subject to the contingency of paying for it himself, if he be unsuccessful. It is easy to understand that an expensive yacht, like this, would require a much larger outlay than $2.50 per day to provide her with safe accommodations and to maintain her in good condition and repair. The finding of the commissioner in this connection was "that the collector took possession of the yacht on the 27th of August, 1891, by placing only one person on board of her; that from this time till the end of September, the collector, through this one representative, remained on board, claiming possession of the yacht; that during all this time she lay in the stream off Stapleton, where it was necessary to have a crew on board to keep her safely, 'as no ship could be secure in any stream,' under such circumstances, without such protection; that he considered that 'while the vessel was in that position' that it was necessary to keep the crew to 'take care of' her, and that at no time did he employ any more men than was necessary for that purpose." "That on the 29th of September the collector, at the request of the libellant, ordered the vessel placed in the Erie Basin, and the marshal took partial possession, the collector having resisted and his representative still remaining on board. The vessel having been thus removed from the stream where she had been at anchor, the captain testifies that he took steps immediately to get rid of the crew, and that they were discharged as fast as he could do so consistently while preparing the vessel for being laid up. There is nothing to contradict this testimony, and it seems to me that the captain pursued a reasonable, as well as judicious, course, one consistent with his duty to take proper care of the vessel. As soon as the marshal, under further process of the court, got exclusive possession of the yacht, on the 8th of October, he put only one man

aboard of her to represent him, and employed the captain and four men to take care of the vessel, besides a night watchman. The marshal's possession being a legal possession, he had the right to take this course, and I do not find anything in the testimony, or in the circumstances of the case, to warrant the conclusion that the expenses of keeping such a vessel while in the collector's or the marshal's possession were extravagant."

Whether these charges were proper or not, was a matter for the courts below to determine in the exercise of their best judgment, and, as the commissioner found that they were, and both the District Court and the Court of Appeals affirmed his action in that regard, we are not disposed to disturb their finding, although the amount seems large.

*The decree of the Court of Appeals must be reversed, and the case remanded to the District Court for further proceedings in conformity to this opinion.*