HENRI PAUCHEY & SON, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31689.   Promulgated March 17, 1931.

*Newton K. Fox, Esq.,* and *Adrian C. Humphreys, Esq.,* for tne petitioner.

*Bruce A. Low, Esq.,* and *Leslie H. Rushbrook, Esq.,* for the respondent.

776

### OPINION.

PHILLIPS:[1] In the petition it is asserted that the lease of May 15 1920, between the Hotel Gramatan, Inc., and Henri Pauchey had a value when paid in for its stock three days afterward of not less than $250,000. In support of this contention petitioner introduced certain witnesses who testified as to the history of the hotel and also two witnesses who testified as experts. The first of these expert witnesses, Demarest, stated that from a real estate standpoint the lease had a value of $150,000, but from the standpoint of this particular lessee it had a value of $250,000. He gave no clear reason for the distinction which he drew, nor is it material what the value of the lease was from the standpoint of Pauchey where we are seeking the value another would pay for it. The second witness, Crandall, placed the value of the lease at, at least, $300,000.

While the Board may not arbitrarily ignore or discredit the testimony of unimpeached witnesses, it should weigh opinion evidence by the facts of the record, the qualifications of the witnesses, and their knowledge of the material facts. Otherwise, we might be placed in the position of determining values out of all proportion to what a willing seller would accept and a willing buyer would offer. *The Conqueror*, 166 U. S. 110; *Balaban & Katz Corporation v. Commissioner*, 30 Fed. (2d) 807; *Am-Plus Storage Battery Co. v. Commissioner*, 35 Fed. (2d) 167; *Saxman Coal & Coke Co. v. Commissioner*, 43 Fed. (2d) 556.

It remains to test the opinion evidence by these standards. Before doing this, it may be pointed out that at the time this lease was paid in for stock, petitioner's officers were uncertain as to its value or rather whether it had any value at all. Thus, while they entered the lease on their books at a value of $250,000, yet in their capital stock tax return, made only two months later they returned as of no value the common stock which had been paid in for the lease. There is a pertinent issue that has not been cleared up, and

---

[1] This decision was prepared during Mr. Phillips' term of office.

that is the circumstance under which the lease was executed. The Lawrence family owned or controlled practically all the stock of the Hotel Gramatan, Inc. They had leased the hotel for the first five years of its existence and operated it through a corporation for the next ten years. They were thoroughly familiar with its earning capacity, and with this knowledge entered into the lease. The same is largely true of Henri Pauchey, who for the past ten years had been assistant manager and later manager of the hotel. It would seem that this lease was entered into at arm's length; that the one party was giving as little as possible and the other obtaining what it could exact. This assumption is apparently verified by the stringent terms of the lease. Yet neither Henri Pauchey nor any member of the Lawrence family was introduced as a witness.

Both the opinion witnesses stated that persons who are engaged in real estate developments similar to those of the Lawrence family were forced to erect hotels which served for advertising purposes, which were generally operated for such purposes and not for profit. While it appears that this hotel was erected as an adjunct to their real estate enterprises, it is an outstanding fact that fifteen years had elapsed between that date and the execution of the lease. The tracts of land owned by the Lawrence interests in the immediate neighborhood of the railway station had been developed and their other properties in the municipality had been developed to the extent of 60 per cent. In 1920 the hotel was not merely an adjunct to another enterprise. It was no longer an experiment. Its reputation had been established and for the past four years (the only prior period of which we are informed) it had been operated at a profit. As set forth in our findings, Henri Pauchey through his management had succeeded in establishing the hotel on a highly successful and profitable basis. Here there is introduced the personal element of the management of a family hotel—an element essential in all hotels, but most peculiar to this class. How far this element entered into the earnings of the hotel we are not informed. It is an important element which none of the witnesses took into consideration in making his estimate as to the value of the lease, although one of the witnesses testified, "one man can earn money in a hotel and another can lose it."

The two opinion witnesses asserted that a lessee could operate a hotel at less expense than an owner, that he would pay less for repairs and would sustain less depreciation on furniture than an owner.

Demarest placed a value on the lease for real estate purposes of $150,000. After stating that he would consider the earnings of the hotel for 1916, 1917, 1918, and 1919 as of importance, he proceeded

to confine himself to the earnings of the hotel for 1919. In his cross-examination the following 'appears:

Q: I understood your first value of $150,000 was placed primarily and exactly upon the earnings during 1919.
A: That is true, yes sir.

Again asked to give his process of reasoning in arriving at this value he answered:

A: I reasoned the lease had a period of fifteen years to run.
Q:. Yes sir.
A: I took its apparent gross income on the period of one year.
Q: What do you mean, current 1919?
A: I say apparent.
Q: Apparent?
A: Yes, and I multiplied that by the the number of years the lease had to run. In the first place I do not consider a fifteen year lease an extremely long lease, and, well, it is not the same value as a long term lease has.

This one year, and that a peak year of inflation resulting from the war, is entirely too narrow a basis upon which to compute the value of the lease which had fifteen years to run. At this time there was a housing shortage in New York City which greatly enhanced the demand for hotel accommodations, but this gave no one the right to expect that such a condition would continue through the life of the lease.

Crandall qualified as a hotel man of large experience and we would be inclined to give weight to his opinion, if he had applied the rule by which he stated he would be governed if he had purchased a hotel lease and if the facts upon which he based his opinion found place in the record. Asked within what period the capital invested should be returned in computing the value of the hotel lease, he answered:

A: The usual period is five years. If a hotel is presented to me I first want to know the earnings for the past five years, and on such basis I would be willing to buy it on five-year earnings. For example if I could see a hotel earned $100,000 a year I would be prepared to negotiate for it at $500,000 so that it would pay itself out in that time. That is usual with all hotel leases which are sold or bought.

It is pertinent to point out that the witness does not disclose the length of the lease which he had in mind. Evidently one would not pay the capital value so computed for a lease that had only five years to run. He further stated that in arriving at the value of this particular lease he would take the net taxable income of Hotel Gramatan, Inc. for previous years and add to it all interest on bonded indebtedness, depreciation on buildings, the excess of depreciation on furniture and fixtures deducted by an owner over that deducted by a tenant, and the excess which the owner would pay for repairs over what a tenant would pay for the same purpose, which

last amount he placed at from $5,000 to $6,000, and from the total deduct the rent required by the lease. Having stated that this was the standard he was applying, he was asked on his cross-examination to apply it to the year 1919, which was the only year he attempted to compute at length. In making this computation he stated that the result was $163,000, which less rent of $75,000 left net earnings around $88,000, which he stated were the figures upon which he reached the conclusion that the lease was worth $300,000. This computation was erroneous in two particulars; first, if we add to the net taxable income of the Hotel Gramatan, Inc. for 1919 all the items which he mentioned, the result is $143,493.27. Again, computing the rent upon the basis of the lease, it would have been $91,200 and the net earnings would have been $52,293.27 instead of $88,000. Making this same computation for the three preceding years, we find that the probable net earnings of the lessee under this lease would have been:

| | |
|---|---|
| 1916 | $6,782.16 |
| 1917 | 14,198.35 |
| 1918 | 49,909.97 |

Each of these computations is made upon the assumption that the lessee could effect a saving of approximately $12,000 a year in cost of repairs and in depreciation of the furnishings. This is largely a matter of conjecture upon which the opinion of the witness would be of little value without much more detailed knowledge of this particular property than he possessed. There are other elements of weakness in this computation, even though we accept the theory that five-year earnings are to be capitalized. We have four years instead of five. This is important when we see how small would have been the net earnings under this lease for the year 1916. The year 1915 might have shown a considerable loss. Another factor is the personal element of the management of Pauchey, mentioned above. Because of the shortage in housing, conditions in the year 1919 were abnormal, as is amply demonstrated by the testimony, which shows the steady decrease in gross income, operating income, and net income after 1920.

In such a situation as we have here we must reach the conclusion that the lease reflected the rental value of the property, accept the opinions of witnesses who apparently had made no adequate preparation to value the lease here in question, or arrive at some value by using the figures shown in the record and applying the general principles embodied in the opinion testimony. In this case we are of opinion that the first is the soundest view. The Lawrence interests had been engaged for years in developing this community. They had received daily reports on the operation of the hotel. They were

in the real estate business and much more familiar with the whole situation than either of the witnesses who expressed an opinion of value. There is no apparent reason why the lease should have been given to Pauchey on more favorable terms than to another equally desirable lessee. Neither party to the lease was called as a witness to show that any unusual situation existed which prompted a lease to Pauchey, which, in the market, would have a value of $250,000. Nor did the petitioner recognize any such value when it made its capital stock tax return. We believe that the contemporaneous estimate of the rental value of the premises and of the lease is more reliable than the very general and generous estimates of the witnesses, made several years after the event.

*Decision will be entered for the respondent.*