D. C. GOODWIN and wife Bernice Goodwin, and Elzie Goodwin and wife Minnie Goodwin, as owners of the fishing vessel THE SWEET PEA, Libellants,

v.

The Fishing Vessel, THE JACKIE B, her Engine, Tackle, Apparel, etc., and W. S. Wells, Jr., her owner, in the case of collision, civil and maritime, Respondent.

No. 386.

United States District Court
E. D. North Carolina,
Wilmington Division.

Jan. 10, 1957.

Wallace C. Murchison (Carter & Murchison), Wilmington, N. C., for libellants.

George Rountree, Jr., Wilmington, N. C., S. Bunn Frink (Frink & Herring), Southport, N. C., for respondent.

GILLIAM, District Judge.

It appears from the uncontradicted evidence that at about 4:00 o'clock a. m., on September 5, 1955, the "Sweet Pea" was rammed and sunk by a wooden hull fishing vessel, the identity of which is at serious issue. Libellants accuse the "Jackie B" and have offered evidence tending to substantiate the accusation, while respondent, the "Jackie B", and her owner, vigorously deny guilt and have of-

fered evidence tending to support the denial. This is the only substantial issue of fact presented and there is no controversy with respect to the applicable legal principles. The guilty vessel presently will be designated as "Vessel X".

The "Sweet Pea" was an oil screw vessel of 77 gross tons and 29 net tons of wood construction, 78 feet long, 16.2 feet beam, and 7.6 feet deep; the "Jackie B" is an oil screw vessel of 44 gross and 17 net tons, of wood construction, 52.6 feet long, 16.8 feet beam; 6.4 feet deep. The "Sweet Pea", while proceeding upstream in Neuse River at 9½ miles was rammed on her port side about 7 feet forward of stern by "Vessel X", which turned into the "Sweet Pea" in violation of the rules, without keeping a proper lookout and in disregard of danger signals from the "Sweet Pea"; the "Sweet Pea" was without fault. "Vessel X" struck head-on at about 90 degrees and pierced the hull of the "Sweet Pea" three to four feet, causing her to sink after about 30 minutes; "Vessel X", as soon as disengaged, immediately left the scene and disappeared in the darkness; she had a name near the bow and top with the capital letter "B" in it, which was not part of a word, and she was strikingly similar in general appearance to the "Jackie B" in these respects; she was painted white and had black rail trim; the capital letter was in black; the pilot house was forward, painted white, 7 to 7½ feet above deck; height of pilot house windows was like "those Florida built boats"; width 13 to 14 feet; length about 55 feet; reasonably high bow. The point of impact to the "Sweet Pea" was just aft of the pilot house and her captain, who was then standing in the port door of the pilot house, was about 12 feet from the letter "B" which he saw from the light of a 50-watt mast light.

The bow of "Vessel X" struck the "Sweet Pea's" dory in its cradle aft of the pilot house, leaving a black mark on its side; the dory was located between 6 and 7 feet above the vessel's deck, so that the port bow of "Vessel X" with the name painted on it was at about the level of the captain's eyes.

"Vessel X" came downstream from the direction of the mouth of Adams Creek and the evidence shows that she came out of this canal; any vessel proceeding down and out of this canal almost certainly would have passed the drawbridge at Core Creek. The bridge records show that the "Jackie B" passed the Morehead City bridge at 12:52 a. m. and Core Creek bridge at 2:00 a. m., and, further, that she was the only vessel having the single letter "B" as part of its name that passed either one of these bridges in the morning of September 5, 1955.

The "Jackie B", whether or not it is "Vessel X", was in the vicinity of the "Sweet Pea" at the time of the collision; it is 8 miles from Morehead City bridge, which was passed by the "Jackie B" at about 12:50 a. m., to Core Creek bridge, which she passed at about 2:00 a. m.; this indicates a speed of about 6.5 miles; after leaving Core Creek bridge the "Jackie B" maintained a speed of about 9 miles; from Core Creek bridge to Neuse River nun buoy No. 6, point of collision, it is 21.45 miles; at a speed of 9 miles she should have arrived at the vicinity of Neuse River nun buoy No. 6 at 4:28 a. m.; the collision occurred at about 4:00 a. m., according to the estimate of the crew of the "Sweet Pea"; neither watch nor clock was available; other evidence in the case leads to the conclusion that the actual time of the collision was between 4:00 and 4:30 a. m.

The foregoing facts found by the Court are established by uncontradicted evidence. Perhaps upon these facts alone, it could not be properly found that the "Sweet Pea" carried the burden of proving that "Vessel X" is the "Jackie B", but there is more. It is admitted that on the morning of the collision the "Jackie B" did sustain damage to its bow. Respondent claims it was caused by striking a beacon a glancing blow and not by ramming the "Sweet Pea". Though there is considerable conflict in the evidence regarding the damage to the "Jackie B",

as to marks and gouges found when she was located about a week later at Hamme's Marine Railway undergoing repairs, the respondent admits that the "Jackie B" was damaged by a collision between 4:00 a. m. and daybreak in the morning of September 5, 1955, as a result of which a long leaf heart pine dutchman in her bow stem was split and torn out. This fact, together with the evidence as to the similarity of "Vessel X" to the "Jackie B" and the evidence showing that she was certainly in the vicinity where the collision occurred at the time that it occurred, makes it reasonable and logical to conclude that the "Jackie B" is guilty.

In an effort to explain the damage to the "Jackie B's" bow, the respondent introduced evidence from the members of the crew of that vessel and members of the crews of three other vessels which were in the fishing fleet with her on the morning of the collision that the damage was caused by striking a beacon. Such evidence was far from impressive; the witnesses were confused as to which beacon was struck and as to how the collision with the beacon happened. And the strength of the evidence is further impaired by evidence showing that just after the morning of September 5, 1955, no beacon along the route covered by the "Jackie B" showed any damage which could have resulted on the morning of September 5, 1955. These facts are established by the evidence of Chief Warrant Officer Jones, who was in charge of maintenance of aides to navigation in this area; he examined all of these aides on August 22, 1955, and found Garbacon Shoal day beacon missing, and Adams Creek beacons 9, 10, 11 and 16 either damaged or destroyed; on September 2 there was no change in conditions in Neuse River and Adams Creek; on September 7, beacons 9, 10 and 11 in Adams Creek were repaired, and on September 8, beacon 16 was repaired; there was no change with respect to the condition of the aides between August 22 and September 7. So that, if the "Jackie B" in reality struck one of the aides to navigation with sufficient force to produce the established substantial damage to its bow, it left no noticeable mark thereon. In my opinion, it would be unreasonable to accept this as the fact. Chief Warrant Officer Jones expressed the opinion that such a blow would have knocked the aide down. It seems clear to me that if a 44 ton vessel proceeding at 8 miles had struck one of the aides with such force as to substantially damage its bow some noticeable damage or mark would have been left. The finding, which I make, that the "Jackie B" did not strike one of the aides, leaves the cause of the damage to her bow unexplained and this situation must leave one with the belief that the real cause was the collision with the "Sweet Pea", a conclusion which seems very reasonable from the other evidence before me. The failure of the attempt to trump up an explanation for the condition of the "Jackie B" leads to the conclusion that the members of the crew of the "Jackie B" and the members of the crews of the other associated vessels were seeking to avoid the consequences of the negligence of those in charge of the "Jackie B". Much like the case of a criminal who offers an alibi to raise a reasonable doubt, his case usually goes down with his alibi.

Perhaps it is somewhat unusual that there was no greater damage to the "Jackie B", but this is a purely hypothetical question, depending upon many factors not established. There is evidence both ways as to what the probable effect to the "Jackie B" would have been, but no one knows, and one may only speculate. However, the evidence to my mind so clearly demonstrates that the "Jackie B" was the offending vessel that speculation should be put aside.

The measure of damages is the cost of restoring the vessel, not greater than its original value, together with such damages for loss of services as are shown with reasonable certainty. The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937.

The libellants' evidence with respect to cost of restoring the vessel and loss of services is uncontradicted, but this does not mean that libellants are necessarily entitled to the full amount claimed.

The amount claimed for restoring, including raising, repairs and replacements, is $22,800.70. Included is an item of $210.00 for surveyor's fee and expenses. This should be eliminated. There are authorities holding a surveyor's fee is recoverable where there is a survey in the true sense, that is when the party to be charged is notified and attends the survey. Such is not the case here.

In the absence of any attack on the reasonableness of cost or necessity of raising or repairs, these items are approved.

The claim includes charges for loss of certain equipment, as follows: 4 mattresses, $59.24; trolling net, $350; 40 net corks, $70; 2 fish shovels, $10; tool kit, $50; a total of $539.24. As to these, I find that libellants are not entitled to recover the cost of replacements, only the value of them, since such recovery will restore them to their original position. The ages of these lost items of equipment was not developed by the proof, but I find it reasonable to say that the total actual value was only fifty percent of their cost new. This situation calls for a further deduction from libellants' claim of fifty percent of $539.-24, or $269.62.

The "Sweet Pea" was out of commission from September 5 until after November 25, but libellants claim that they were deprived of her services in shrimping for only six or seven weeks.

The evidence shows that the libellants' net take from the "Sweet Pea" was $501 during the week before the collision, and that for thirteen weeks shrimping in Florida after December 10, 1955, their net weekly take averaged $443.84. For this I deduce that libellants' net take for the six or seven weeks for which they make claim probably would have been $3,055, barring all adverse contingencies, such as unfavorable weather, poor fishing, breakdowns and the like. I find it proper to deduct because of such contingencies twenty-five percent of $3,055, leaving a recoverable amount on this score of $2,291.00.

Upon the foregoing facts it is adjudged that libellants are entitled to recover against the "Jackie B", her engines, tackle, apparel, etc., and W. S. Wells, Jr., the owner, the sum of $24,-612.00, as follows:

1. For bill of Barbour Boat Works, raising and repairing hull and equipment — $14,162.89
2. For bill of Machine & Supply Co., Inc., new engine, repairing and replacing damaged electrical equipment, less $1500., representing the difference between new engine and cost of repairing damaged engine — 7,528.57
3. For loss of "Sweet Pea's" equipment — 629.62
4. For loss of services of "Sweet Pea" for 6½ weeks — 2,291.00

The evidence, in my opinion, shows that libellants are entitled to a decree as indicated, together with interest from date of entry of decree.