SMITH and VAN FOSSAN dissent on the second point.

VAN DORN IRON WORKS CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9869.   Promulgated January 23, 1929.

*W. B. Stewart, Esq.*, for the petitioner.
*Maxwell E. McDowell, Esq.*, for the respondent.

6

OPINION.

LITTLETON: The first issue involves the determination of the values of petitioner's plant assets which may be properly included in invested capital. Between 1892 and 1912 several additions were made to petitioner's plant through the acquisition of land, the construction of new buildings, and the purchase of machinery and equipment. Because of the inadequacy of the accounting records maintained by the petitioner during that period, the cost of none of these additions to plant appear upon the books of account, and there are no authentic records from which such costs may be accurately determined now.

Following an assessment against the petitioner in 1912, for additional excise taxes, and after the continuous urgent suggestions of the other executive officers that an adequate accounting system be installed, J. H. Van Dorn, then petitioner's president and owner of 98 per cent of its capital stock, agreed to the installation of such a system and the opening of proper accounts for plant assets. To accomplish the latter it was necessary to determine upon values of the plant assets to be written upon the new books, and Van Dorn instructed his son, T. B. Van Dorn, then petitioner's chief engineer to make an appraisal of plant and equipment. In this work the latter was assisted by H. A. Rock, apparently at that time a draftsman in petitioner's employ. When the appraisal figures were submitted to the elder Van Dorn, he considered them too high, and, as the testimony relates, not being desirous of being known or referred to as a rich man, he revised the appraisal figures downward, the reductions on various items ranging from 33⅓ to 50 per cent of the appraised values, and instructed the bookkeeper to place the revised figures upon the books of account. Thus, the plant asset accounts were opened under captions and in amounts as follows:

| | |
|---|---|
| Land | $84,000.00 |
| Buildings | 124,914.38 |
| Machinery, tools and equipment | 166,846.00 |

The data prepared by the younger Van Dorn and Rock in their appraisal work was in mere memorandum form and was not made a matter of record.

In 1917 petitioner's properties were appraised by an appraisal company, as a result of which the book values of land and buildings were increased $162,104 and $172,599.01, respectively, a total increase of $334,703.01. This increase in book values of land and buildings was allowed as a part of invested capital for 1917, as evidenced by the letters addressed to the petitioner by the Income Tax Unit under date of June 7, 1920, and October 2, 1923, but was disallowed by the Commissioner as invested capital for 1918 and 1919.

Before considering the issues as to values, certain questions of estoppel should be disposed of, which are set forth in petitioner's brief as follows:

1. The decision of Commissioner William M. Williams, as set forth in his letter of June 7, 1920, allowing the claimed item of $334,703.01 as invested capital for 1917, is conclusive upon his successor David H. Blair.

2. The decision of Commissioner David H. Blair, as set forth in his letter of October 2, 1923, allowing this claim as invested capital for the year 1917, is conclusive upon him with respect to the years 1918 and 1919.

3. At least the decision of Commissioner Blair upon the question of invested capital is prima facie correct, and should stand until the Commissioner overcomes that presumption by assuming and sustaining the burden of proof. In this case he has not done so.

4. Under the facts of this case petitioner relied upon the foregoing findings and decisions and changed its position, and the Commissioner, therefore, should be estopped from disallowing this item of invested capital.

Substantially the same questions as are here involved have been considered by the Board and decided adversely to the contention of the petitioner. *Mather Paper Co.*, 3 B. T. A. 1; *Boyne City Lumber Co.*, 7 B. T. A. 36; *James Couzens*, 11 B. T. A. 1040.

The Commissioner has made a determination in respect of the taxable years and the petitioner questions that determination in this proceeding. The burden of showing error is upon the petitioner. The fact that the Income Tax Unit or the Commissioner at some other time or in another taxable year may have made a different determination is not conclusive upon the Board and does not shift the burden of proof in this proceeding to the Commissioner.

The nature of the invested capital issue requires proof of the cost of the additions made to petitioner's plant between 1892 and 1912, and of the total depreciation sustained to the beginning of the taxable years under consideration in respect of those additions. This the petitioner has attempted to supply through the testimony of three witnesses, two of whom gave opinion evidence as to the probable cost of the plant additions, and, in a way, as to the depreciation sustained thereon to January 1, 1912. The first of these witnesses, T. B. Van Dorn, was petitioner's chief engineer, in charge of plant maintenance and construction. All of the buildings erected during the period mentioned were largely designed and constructed under his supervision. He testified that upon the completion of each building he compiled the costs of material and labor consumed in the work of construction, for the benefit of his father, and in that way became familiar with the cost of each building. He did not presume to state the actual cost of the buildings, but gave the approximate cost of each according to his best recollections. The following is a summary of his testimony as to the cost of the buildings:

Building No. 1. Executive offices_____ Cost about $15,000.
2. Structural shop_____ Cost somewhere between $25,000 and $27,500.
3. Engine room_____⎱ Cost something like $3,-
4. Boiler and tank room_____⎰ 500 to $4,000.
5. Blacksmith shop_____ Cost between $6,000 and $7,000.
6. Hangar shop_____ Cost about $6,500.
7. Pattern shop_____ Cost around $7,500.

Building No. 8. Hangar storage_____ Cost not over $1,000.
9. Jail shop_____ Cost somewhere between
$100,000 and $110,000
10. Lumber sheds_____ Averaged about $750.
17. Brass foundry_____ Cost about $6,500.
17a. Assembling room_____ Cost about $6,000 to
$6,500.
19. Structural and jail whse_____ Cost about $15,000.
21. Metal furniture machine shop_____ Cost something over $25,-
000. ·
22. Metal furniture assembling room_ Cost about $12,000 or
$14,000.
23. Crating and shipping room_____ Cost $2,500.
24. Storage shed_____ Averaged about $750.
25. Stable_____ Averaged about $750.
26. Rope shed_____ Averaged about $750.
27. Cement shed_____ Cost not over a few
thousand dollars.
30. Sheet metal storage_____ Cost about $5,000.
34. Shipping and receiving room_____ Cost about $6,000.

The witness Van Dorn further testified that the hangar shop, pattern shop, hangar storage, metal furniture shop, brass foundry, assembling room, and crating and shipping room, being buildings numbered 6, 7, 8, 14, 17, 17a, and 23, respectively, had been torn down or otherwise destroyed prior to the taxable years under consideration. He did not give an opinion as to the cost of the metal furniture shop, but his minimum costs on the other six buildings total $30,000. He testified also that the blacksmith shop, building No. 5, was still standing, although the witness Rock testified that the building had been torn down, and there is nothing in the record to indicate which of these two witnesses testified correctly on this matter. Certainly the testimony of this witness, with its averages and ranges of cost, the doubt cast upon it by the conflicting testimony of another witness, and containing nothing as to the depreciation sustained on the additions to the beginning of the taxable years under consideration, is of little value in the solution of the issue confronting us. Its only value perhaps, small as it is, is in its indication of the probable minimum cost of the buildings erected between 1892 and 1912; and when it is regarded that this witness is attempting, from memory alone, to fix the costs of building construction extending over a period of 35 years, to say nothing of the fact that his are self-serving declarations, much of that value disappears.

The witness Walker was called to give opinion testimony as to the probable cost of the buildings constructed during the period stated. He expressed an opinion as to the cost of constructing only 9 of the

25 buildings erected during the period mentioned. The following is a summary of his testimony:

| Building | | Cost |
|---|---|---|
| No. 1. | Executive offices | $16,358 |
| 2. | Structural shop | 36,933 |
| 9. | Jail shop | 104,272 |
| 19. | Structural and jail whse | 20,034 |
| 21. | Metal furniture machine shop | 43,067 |
| 22. | Metal furniture assembling room | 16,359 |
| 27. | Cement shed | 1,531 |
| 30. | Sheet metal storage | 6,646 |
| 34. | Shipping and receiving room | 7,193 |

However, certain facts were developed in the taking of the testimony of this witness which detract greatly from its value and preclude its acceptance as proof of the cost of the building as to which he testified. In the first place, Walker testified that while he had occasionally passed petitioner's plant while walking on the street, he had never been within its confines until called in to make his appraisal in 1927. The evidence shows that of the nine buildings which this witness appraised, there had been structural changes and improvements in five of them since originally erected. Walker saw these buildings as they stood in the early part of 1927. Did he take these changes in the buildings into consideration in arriving at his cost figures? The only evidence along that line is that he disregarded what he considered were modern improvements and could not have been in the buildings when they were constructed. But this leaves much to be desired in the way of assurance that changes and improvements made after February 1, 1912, which have been properly recorded on the books, would not be twice included in invested capital were Walker's figures accepted. Further, this witness testified that in arriving at his cost figures, he did not take into consideration the fact that all of the structural iron used in the erection of the buildings had been fabricated in petitioner's plant. It is but logical reasoning that this petitioner, being engaged in the fabrication of structural iron as a regular business, could and would produce whatever quantities of that material necessary for the construction of its buildings at prices less than that at which it could be obtained from building contractors. The testimony of the witness Van Dorn indicates that to have been the real situation. How great the difference between the cost to petitioner to produce the structural iron used in its buildings and the price which the witness Walker put upon it we do not know. That in the total it must be large, seems certain, since the descriptions of the buildings indicate that structural iron was extensively used in nearly all of them. In this connection the witness Van Dorn testified as follows:

My experience after leaving college was gained at one of the best bridge companies in the country, and the building codes allowed certain factors of safety of steel construction, but it was the general practice in those days to use more material than you needed in a building. For instance, I built the Williamson building [building No. 1] and I know that building is twenty-five per cent heavier in steel than it would be if built today. In designing these buildings I worked my material very economically and I believe that in all the steel work in those buildings we put it out for twenty-five per cent less than an architect at that time would have put into the job. I believe that the buildings are very economically built, very economically constructed. They were very cheap and economical buildings.

That is the testimony of the men who designed and constructed the buildings, and it evidences the inaccuracy of Walker's figures, which are based in part upon the prevailing market prices for structural iron at the dates of construction of the several buildings. Also, Walker made no attempt to determine the amount of depreciation sustained upon the buildings. He merely stated in a categorical fashion that according to his records, and the records of other contractors, and in his opinion, buildings of the type erected by petitioner depreciated at the rate of 2 per cent per annum.

Finally, we have the testimony of the witness Nims, who has been engaged for 20 years in the building-construction business. The company with which he is connected did some building construction for the petitioner in 1915 and 1916. This witness had inspected the petitioner's plant in 1914, in connection with some construction work, and was called in early in 1927 to make a cost appraisal of petitioner's plant. The following is a summary of his testimony.

| No. | Building | Cost | Depreciated cost at Feb. 1, 1912 |
|---|---|---|---|
| 1 | Executive offices | $17,286 | $13,828 |
| 2 | Structural shop | 24,528 | 19,009 |
| 5 | Blacksmith shop | 6,746 | 6,554 |
| 6 | Hangar shop | 6,855 | 5,092 |
| 7 | Pattern shop | 6,120 | 5,650 |
| 9 | Jail shop | 101,524 | 94,417 |
| 14 | Metal furniture shop | 47,507 | 40,380 |
| 17a | Assembling room | 7,124 | 6,554 |
| 19 | Structural and jail whse | 16,285 | 15,470 |
| 21 | Metal furniture machine shop | 38,013 | 35,352 |
| 22 | Metal furniture assembling room | 11,880 | 11,048 |
| 23 | Crating and shipping room | 3,935 | 3,775 |
| 27 | Cement shed | 2,412 | 2,050 |
| 30 | Metal storage room | 5,178 | 5,178 |
| 34 | Shipping and receiving room | 5,784 | 4,750 |

Certain facts were developed in the cross-examination of this witness which preclude the acceptance of his testimony as proof of the cost of the buildings in respect of which he testified, and, as a matter of fact, warrant the rejection of his testimony *in toto*. This witness very clearly and definitely stated on the witness stand that

his quantitative analysis of materials and labor used in the construction of these buildings was made in 1927, and yet two other witnesses testified that five and perhaps six of the buildings, as to which Nims fixed a total cost of $78,287 and a depreciated cost of $68,005 at February 1, 1912, had been destroyed or torn down prior to 1927. Nims testified as follows:

Q. Mr. Nims, you have testified to the fact that you have been through the plant here in question at least ten times. At what dates and what years were those visits made? When was the first one made, for instance?

A. In 1914, I would say.

Q. When was this analysis of quantities, quantitative analysis of materials in those buildings made to which you have testified?

A. They were made the first part of this year, our analysis was.

The buildings which the record shows were torn down prior to 1927, and as to which the witness Nims testified as to their cost based upon a quantitative analysis of materials and labor entering into their construction in the early part of 1927, are the hangar shop, pattern shop, metal furniture shop, assembling room, and crating and shipping room; as to the sixth, the blacksmith shop, there is a conflict of testimony as to whether it has been torn down or is still standing. Nims testified that the analysis of the buildings which he made in 1927 was the only one he ever made for appraisal purposes, and that the costs which he testified to were based upon that analysis. But there is nothing more certain than the fact that Nims could not have made an analysis of these buildings by physical measurement which were not in existence at the time his appraisal is presumed to have been made. In the absence of any explanation of the situation to which we refer, we can not place any credence upon the testimony of this witness.

The petitioner by amendment to its petition, alleged that the actual cost of its machinery, tools and equipment was not less than $340,000. No evidence was offered in support of this allegation.

In support of the value of land shown on its books and claimed for invested capital purposes, the only evidence offered by the petitioner consists of an appraisal made by the Cleveland Real Estate Board, fixing the fair value of the land as of March 1, 1913, at $209,818, a receipted tax bill for 1913 for taxes paid to Cuyahoga County on petitioner's realty, together with a letter from the auditor of that county to the petitioner, dated May 12, 1920, explaining the percentage of true values utilized by the county appraisers for tax purposes. This land was purchased during the period 1892 to 1912, and its value in 1913 is wholly immaterial for invested capital purposes. Certainly the evidence submitted can not be accepted as proof of the cost of the land to the petitioner, and we do not understand that it was submitted with that idea in view. However, petitioner calls our atten-

tion to the great difference in the land value written on the books of account in 1912, to wit, $84,000, and the 1913 value of the land as appraised by the Cleveland Real Estate Board, and points out that this situation evidences that the 1912 book value must have been considerably less than the actual cost of the land. That however is a conclusion unsupported by any proven facts.

On the whole, the evidence is not sufficient to establish any higher values for the plant assets of the petitioner than those which the Commissioner has allowed for invested capital purposes. See *W. S. Rogle & Co.*, 5 B. T. A. 541; affd. 26 Fed. (2d) 771; *The Conqueror*, 166 U. S. 110.

On the second issue, the petitioner concedes that the Commissioner's adjustments of invested capital for both years on account of income and profits taxes of preceding years conform with the regulations of the Commissioner in force during those years, and that under the provisions of section 1207 of the Revenue Act of 1926 such adjustments must be approved. In his answer to the petition the Commissioner alleged the adjustments referred to are improper, in that the amounts of such reductions represent the taxes prorated from the due dates of payment, whereas, the petitioner being on the accrual basis, the reductions should have been for the full, and not the prorated, amounts of taxes. This position the Commissioner has apparently abandoned since counsel made no reference thereto at the hearing, and it is not touched upon in his brief. However, it is sufficient to say that Commissioner has offered no proof that the adjustments of invested capital which he made, on account of income and profits taxes of the prior years, do not conform with the provisions of section 1207 of the Revenue Act of 1926.

*Judgment will be entered for the respondent.*