DAVID B. ROBERTS *v.* UNITED STATES (No. 3193)[1]

[1] T. D. 43653.

216

United States Court of Customs and Patent Appeals, October 28, 1929

*Morris Douw Ferris* (*Hunt, Hill,* and *Betts* of counsel) for appellant.
*Charles D. Lawrence,* Assistant Attorney General (*Marcus Higginbotham,* special attorney, of counsel), for the United States.

[Oral argument October 9, 1929, by Mr. Ferris and Mr. Higginbotham]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

In 1926 the appellant, David B. Roberts, had constructed for himself at Bremen, Germany, a motor vessel or motor yacht to which was given the name *Dreamer*. After being there built the United States consul granted a provisional certificate of registry, and she proceeded by her own propulsion and on her own bottom from Bremen to Hamburg. From Hamburg she was shipped on the deck of a steamer to Montreal, Canada, from whence she proceeded on her own bottom and under her own power, with her owner on board, via Rouses Point on Lake Champlain, down the Hudson River and through Long Island Sound to Hartford, Conn. She was there entered as a vessel arriving from a foreign port by the collector of customs; the certificate of provisional registry was surrendered to the collector and application made for documentation. This application

was made in writing on August 10, 1926, and there is no evidence of any refusal of documentation.

April 1, 1927, the owner made a consumption entry for the yacht under protest as "Merchandise imported." Duty was assessed against it in the amount of $5,326.80. This was paid under protest on June 15, 1927, and notice of dissatisfaction given and protest made in regular form.

The collector held it to be dutiable as a motor boat under paragraph 370, Tariff Act of 1922, which reads as follows:

PAR. 370. Airplanes, hydroplanes, motor boats, and parts of the foregoing, 30 per centum ad valorem.

Appellant claimed it to be duty-free and appealed to the United States Customs Court. That court sustained the action of the collector and overruled the protest, judgment being entered accordingly. From that action appellant appeals to this court, and here insists:

1. The yacht was not "goods, wares, and merchandise" within the meaning of the Tariff Act.

2. It was not an article imported into the United States as those words are used in the Tariff Act.

3. That the yacht was not imported into the United States as that word is used in the Tariff Act.

4. That the yacht was *sui generis* under Revised Statute 4131, the decisions of the United States Supreme Court and the decision of the Treasury Department.

5. That the yacht was "a vessel of the United States," had arrived at a port of the United States and was recognized as such.

6. That as a pleasure yacht over 5 tons net, the vessel comes within the terms of T. D. 41241.

There are 42 assignments of error.

We are of opinion that the case may and should be decided upon the answer to the question, "Is the article a motor boat in the sense of paragraph 370 of the Tariff Act of 1922?"

The provisional certificate of registry, the permanent documentation, the consolidated certificate of enrollment and yacht license, etc., are not, we think, relevant to the issue nor determinative of it, nor do we think the fact that the vessel came into a port of the United States under her own power and upon her own bottom from Montreal, to which place she was transported across the ocean on the deck of a steamer, affects the question of her dutiable status.

We feel constrained, therefore, to omit any review of the arguments made concerning these questions and proceed, without complicating the opinion with a discussion of matters which we think irrelevant, to determine and decide the issue upon which the case must turn.

Is the *Dreamer* a motor boat in the sense of the tariff law?

That she is a vessel in the commonly accepted sense of that term we do not question, nor do we find any reason to hold that the desig-

nation of yacht is inapplicable. She doubtless may be propeily described as a pleasure yacht. She was constructed of wood and steel with five water-tight steel bulkheads. According to the finding of the Customs Court, quoting from the figures contained in her enrollment license issued by the Secretary of Commerce, "her registered length is 58%₀ feet, breadth 12%₀ feet, depth 5%₀ feet, and her gross capacity is 34.75 tons, net 21 tons." She has provision for a crew of two men in the forecastle who are described as a captain and a deck hand. The owner's quarters are sufficient to accommodate eight persons on overnight trips, with room for 30 persons on day trips. She has a speed of 15 miles an hour and a cruising radius of 390 miles. *She is powered with two gasoline internal-combustion engines.* This is her sole motive power. It is true she has a mast "for sail or signaling," but there is no suggestion that she is a sail boat.

Numerous witnesses, whose testimony we think was entirely competent and who qualified as persons familiar with craft of this character, testified that she is a motor boat in the trade sense, which we think does not materially differ from the definitions of motor boat given now and at the time of the passage of the act of 1922 in those dictionaries which are recognized as standard authorities.

In Funk & Wagnalls' dictionary the word "motor-boat" is given as a compound word and is defined—

A boat having a gasoline, oil, gas, electric, or other motor as its means of propulsion.

Illustrating the definition, it continues—

Motor-boats vary greatly in size and are usually built on typical boat lines and include the cruiser motor-boat, day m., or open m. (cabinless), designed for short trips), dory m., runabout m., whaleboat m., whaleboat cruiser m., yawl m., (etc.).

Webster's new International Dictionary defines a motor boat as—

A boat propelled by a motor, especially by a gasoline engine.

The witness, Sutphen, was asked—

Basing your answer on your experience of 35 years engaged in selling at wholesale motor boats throughout the country, I ask you what is a motor boat?

To which he replied—

A boat propelled by an internal-combustion motor—

and further stated that this was his understanding of the definition as applied in trade and commerce of the United States.

His testimony continued—

Q. Is the common meaning or trade meaning about the same, does it include or exclude a boat driven by a motor?—A. A motor boat driven by motor only.

Q. Is that limited in any way to the size of the boat itself?—A. It is not.

Q. So that a boat running from 18 feet to over 100 feet in length, if propelled or driven by a motor, what you call an internal-combustion engine?—A. Internal-combustion engine, gasoline, or heavy oil.

Q. Would be a motor boat?—A. It would.

Q. That has been true during the 35 years of your experience?—A. Since we had to do with motor boats.

Q. How long has that been?—A. From the first motor up to the present time.

Q. I mean manufactured by the Elco Works.—A. We built electric launches at the beginning. We started building motor boats about 1900.

Q. I show you the Exhibit 5 which is two photographs of the boat here in question and the Exhibit 6 which is also a photograph of the importation here in question, and ask you to look at those and to tell us whether or not that would be included or excluded from either the trade term or the common meaning as understood in trade of the term motor boat?—A. These are photographs of the same boat?

Q. Yes; all photographs of the same boat.—A. That would be considered in the trade as a motor boat.

Q. It would be included within the term "motor boat"?—A. It would.

Several other witnesses testified to the same effect and there is no evidence whatever contradicting them.

That there have been developments and improvements in motor boats since the date of the passage of the present tariff law in 1922 is probably true, but so far as the fundamental character of the craft so designated is concerned, it was the same then as it is now. Congress saw proper in paragraph 370 of that act to levy a duty upon motor boats *eo nomine,* and we are unable to see where the act of 1910 relating to navigation regulations and having nothing to do with customs duties has any bearing upon the issue before us, nor, so far as the *Dreamer* is concerned, do we see any relevancy in the tonnage-tax statutes.

The case relied upon most strongly by appellant is that of the steam yacht *Conqueror,* 166 U. S. 110.

The *Conqueror* was a steam pleasure yacht of 372 tons built in England and brought to the United States in 1897. There was much litigation which grew out of that transaction not deemed necessary to be here reviewed. The only factor in that litigation to which we deem it essential to refer in connection with the case at bar may be summed up in the question, "Was the *Conqueror* dutiable under the Tariff Act of *October 1, 1890?*" It was held not to be. That was decided at the October term, 1896, of the Supreme Court of the United States—33 years ago.

The act of 1890 had no provision for a tax upon vessels *eo nomine* and the court held they could not be included as "manufactures of wood and iron" which it declared was the only general description under which they might be included, if held subject to duty.

Since that decision, Congress has five times made general revisions of the tariff laws, the latest being the act of 1922, paragraph 370 of which is involved in the instant case. The decision of the Supreme Court, as of course, became the law and was operative and binding until changed by the act of Congress.

Congress had the power to change the law and, so far as motor boats of the character and type of the *Dreamer* are concerned, we think it did so in the act of 1922. It is quite true, as was stated in the opinion in the *Conqueror* case, *supra* "that from the foundation of the Government, vessels have been treated as *sui generis,* and subject to an entirely different set of laws and regulations from those applied to imported articles." In 1922, however, Congress changed this policy, so far as those vessels which are motor boats are concerned, and provided for their taxation under the customs laws. The fact that the vessel has complied with the navigation laws and regulations and conformed to the tonnage statute, if there be any applicable to her, does not alter the *eo nomine* designation in the customs law. It is upon this *eo nomine* designation that we rest our decision. We agree with the Customs Court that the *Dreamer* is a motor boat as provided for in paragraph 370 of the Tariff Act of 1922, and dutiable thereunder at 30 per centum ad valorem.

The only other assignment of error which we deem it necessary to pass upon specifically is No. 1, which reads as follows:

1. In that the third division of the United States Customs Court, composed of Justices Waite, Young, and Cline, is not the division of the court to which was referred, and had no jurisdiction as so composed of, an entry made under duress and protest dated April 1, 1927, which was tried and submitted on March 20, 1928, two months prior to the appointment and qualification of Justice Cline.

It does not seem to us that this objection is well taken. While Associate Justice Cline may not have been a member of the court at the time of the argument of the case, she was a duly sworn and qualified member, sitting as a member of Division 3 when the opinion was written and the judgment rendered. Of this fact this court is charged with judicial knowledge. So far as the assignment of the case to Division 3 is concerned, there is nothing in the record to indicate in any way that it was ever assigned to any except this division, and the contention of appellant appears to be that because she was not on the court at the time of the assignment of the case to the division of which she subsequently became a member, and, because the *opinion* appears to have been signed by only Justices Cline and Young, there should be a reversal on this technical ground. This contention, we think, is not sound when it appears, as is the case here, that the *judgment* was regularly entered, in accordance with the practice prevailing in the Customs Court, under orders of one of its divisions consisting of three justices, not less than two of whom, when agreeing, could determine the cause and render the judgment. It is from the judgment and not from the opinion that the appeal was taken.

The judgment of the Customs Court is *affirmed.*