UNITED STATES *v.* WILLIAM HERMAN WEPNER (No. 4445)[1]

[2] C. A. D. 282.

United States Court of Customs and Patent Appeals, May 22, 1944

*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue* and *Sybil Phillips*, special attorneys, of counsel), for the United States.

*Lawrence & Tuttle* (*George R. Tuttle* of counsel) for appellee.

[Oral argument April 5, 1944, by Mr. Donohue and Mr. George R. Tuttle]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges [2]

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, sustaining the protest of William Herman Wepner (hereinafter referred to as appellee) against the collector's action in classifying a certain motor-propelled boat, under paragraph 412 of the Tariff Act of 1930, as a manufacture "of which wood * * * is the component material of chief value," and assessing duty thereon at the rate of 33⅓ per centum ad valorem.

---

[2] Lenroot, Judge, sat during the argument of this case, but resigned before the opinion was prepared.

The claim of the protest which the trial court sustained reads:

The Motor Boat covered by this entry is a vessel within the meaning of RS 3, 1 USC 3, and consequently is not subject to duty under any provision of the Tariff Act of 1930.

There was an alternative claim to the effect that if dutiable the proper rate is 15 per centum under paragraph 370 of the Tariff Act of 1930 as amended by the Canadian Trade Agreement, proclaimed November 25, 1938, T. D. 49752, but, for reasons hereinafter stated, that claim was not pressed, and, while paragraph 370 requires consideration in connection with the matters of legislative history, the claim thereunder is not involved in the appeal. That paragraph is hereinafter quoted.

Section 3 R. S. (1 U. S. C. § 3), under which the protest was sustained, reads:

The word "vessel" includes every description of water craft or other artificial contrivance used, or capable of being used, as a means of transportation on water.

In making the classification and assessment the collector acted in conformity with a Department ruling expressed in T. D. 42913 (54 Treas. Dec. 129) issued August 13, 1928, to the effect that boats or vessels if less than 5 net tons should be assessed with duty at the appropriate rate according to the component material of chief value.

There is no dispute concerning the facts. The boat appears to have been constructed in Canada in the fall of 1924, purchased by appellee in 1939, and brought into the United States under its own power. It arrived at the port of Anacortes, Wash., where it was entered July 5, 1939. On the *pro forma* invoice accompanying the entry it is stated:

One Br. Gas Screw gill net boat called "Francis" built at Prince Rupert, B. C. in the fall of 1924 by John S. Swanson, of 3 net tons burden and licensed at Vancouver, B. C. on the 3rd day of July, 1939.  * * *.

We quote the following from the decision of the trial court:

The evidence shows that the *Francis* was purchased in 1939 by the plaintiff. It was a gill net fishing boat, and although it was equipped for such work it was not used nor was it intended to be used for such purpose by the plaintiff, but rather was used as a pleasure boat. It was of 3 tons net weight, 29 feet long, 8-feet beam, drew about 3½ feet of water, and had an 8-horsepower engine, and also contained berths for two and had a cook stove. It appears to have been seaworthy enough to successfully undertake a trip from Seattle to Ketchikan, Alaska.

It does not appear that the boat was ever registered or documented as a vessel under the laws of the United States.

Determination of the controversy has required consideration of the legislative history of certain provisions of both customs laws and internal revenue laws, relative to duties and taxes on vessels and boats, in the light of administrative acts performed under such laws, and also in the light of judicial decisions construing such laws.

The earliest decision to which reference need be made here is that

of the Supreme Court of the United States in the case styled *The Conqueror*, 166 U. S. 110. It appears that *The Conqueror* was a "seagoing, schooner-rigged, screw steamship, 182½ feet long, nearly 25 feet wide, and of 372 tons burden" constructed in a foreign country and purchased by a citizen of the United States for use solely as a pleasure yacht, the purpose for which it was designed. It crossed the ocean under its own power, arriving at New York about July 6, 1891, and was entered and documented as a vessel. It is sufficient to state, without reciting details, that the primary question (and the only one having any relation to the issue here involved) presented to and determined by the Supreme Court was whether the vessel was taxable under the tariff laws (tariff act of October 1, 1890) then existing. The court held that it was not subject to such taxation, stating, *inter alia*:

* * * the decisive objection to the taxability of vessels as imports is found in the fact that, from the foundation of the Government, vessels have been treated as *sui generis*, and subject to an entirely different set of laws and regulations from those applied to imported articles.

After quoting the above from the Supreme Court's decision (which was rendered in March 1897), the trial court in its decision in the instant case recited certain legislative and judicial history as follows:

Although, of course, it had the power, it does not appear that Congress made any attempt to change or modify the rule of the *Conqueror* case until the enactment of the Tariff Act of 1922. It is true that in section 37 of the Tariff Act of 1909 an annual tax equivalent to a tonnage tax of $7 per gross ton as imposed on the use of "every foreign-built yacht, pleasure-boat or vessel, not used or intended to be used for trade, now or hereafter owned or chartered for more than six months by any citizen or citizens of the United States." In lieu of the foregoing annual tax an alternative provision provided that the owner of such yacht, boat, or vessel might pay a duty of 35 per centum ad valorem thereon. It was held, however, in the case of *Frank A. Steele* v. *United States*, T. D. 30354, that such exaction was not a duty on imported merchandise but was made on the ground of ownership of the vessels and their use otherwise than for trade or commercial purposes.

The provision was repealed by the Tariff Act of 1913, but in the War Revenue Act of 1917, section 603 thereof (40 Stat. L. 318) imposed an annual tax on the use of pleasure boats of over 5 tons, and this provision was continued down to and including section 702 of the Revenue Act of 1926 (44 Stat. L. 95), being limited, however, beginning with section 1003 of the Revenue Act of 1921 (42 Stat. L. 297) to such boats when foreign-built.

In the meantime, when the Tariff Act of 1922 was enacted, it contained paragraph 370, which reads as follows:

Airplanes, hydroplanes, motor boats, and parts of the foregoing, 30 per centum ad valorem.

Here, we think, was the first indication of an intent on the part of Congress to depart from the policy expressed in the *Conqueror* case and to include certain vessels within the category of "articles" made dutiable by the provisions of the tariff laws on importation.

It will be observed that "motor boats" appearing in paragraph 370 of the Tariff Act of 1922 was an *eo nomine* designation and not legis-

latively defined. Under that act there arose the case of *David B,
Roberts* v. *United States*, 17 C. C. P. A. (Customs) 215, T. D. 43653,
involving the dutiable status of an imported motor-propelled boat
registered as being $58\frac{1}{10}$ feet in length, $12\frac{9}{10}$ feet in breadth, and $5\frac{9}{10}$
feet in depth, with a gross capacity of 34.75 tons and a net capacity
of 21 tons, used as a pleasure boat. We there affirmed the decision of
the United States Customs Court holding that the boat was subject to
the customs duties provided in paragraph 370, our decision being based
solely on the *eo nomine* designation. In the course of our decision
distinguishing that case from the *Conqueror* case, *supra*, we said:

* * *. It is quite true, as was stated in the opinion in the *Conqueror* case,
*supra*, "that from the foundation of the Government, vessels have been treated as
*sui generis*, and subject to an entirely different set of laws and regulations from those
applied to imported articles." In 1922, however, Congress changed this policy,
so far as those vessels which are motor boats are concerned, and provided for their
taxation under the customs laws.

In that case the courts had no occasion to consider any provisions of
internal revenue acts, as distinguished from acts imposing customs
duties, but such is not the situation here, and it is necessary in order
to obtain the correct perspective of the legislative history incident to
the issue, to look to certain provisions in certain internal revenue acts.

Paragraph 370 of the Tariff Act of 1930, as originally passed, reads:

PAR. 370. Airplanes, hydroplanes, motor boats, and parts of the foregoing, 30
per centum ad valorem. The term "motor boat," when used in this Act, includes
a yacht or pleasure boat, regardless of length or tonnage, whether sail, steam, or
motor propelled, owned by a resident of the United States or brought into the
United States for sale or charter to a resident thereof, whether or not such yacht
or boat is brought into the United States under its own power, but does not include
a yacht or boat used or intended to be used in trade or commerce, nor a yacht or
boat built, or for the building of which a contract was entered into, prior to De-
cember 1, 1927.

The paragraph was modified as to the duty rate (but not otherwise)
by the Canadian Trade Agreement, T. D. 49752, which was in effect
at the time the boat here involved came into the United States.

It will be observed that in the paragraph Congress legislatively
defined the term "motor boat," and broadened its definition beyond
the ordinary dictionary definitions of the term, in that it provided for
the inclusion of yachts or pleasure boats propelled by sail or steam, as
well as those propelled by motor, within the definition. Also, it
provided, in effect, that all the yachts or pleasure boats should be
subject to the duty *"regardless of length or tonnage."* [Italics ours.]

By the last part of the paragraph, however, two classes of yachts
or boats were excluded from the definition, viz, (1) "a yacht or boat
used or intended to be used in trade or commerce" and (2) "a yacht or
boat built * * * prior to December 1, 1927." Under the facts
here appearing, the involved boat fell within the second class and,

hence, concededly was not subject to the duty provided in paragraph 370, *supra*.

The phraseology of paragraph 370, *supra* (which supplanted paragraph 370 of the Tariff Act of 1922 under which the *Roberts* case, *supra*, was decided), did not originate in the Tariff Act of 1930, but in the Revenue Act of 1928.

As stated by the trial court, in substance, various internal revenue acts (as distinguished from tariff acts) were passed by the Congress during the period beginning in 1917 and extending to 1928 in which taxes were levied on the use of pleasure boats, such taxes being limited, beginning with section 1003 of the Revenue Act of 1921, to foreign-built boats. It is unnecessary here to recite the provisions for such taxes in the acts prior to the Revenue Act of 1926 (44 Stat. L. 95) which, as section 702, embraced a provision, the pertinent part of which reads:

SEC. 702. On and after July 1, 1926, and thereafter on July 1 in each year, and also at the time of the original purchase of a new yacht or other boat by a user, if on any other date than July 1, there shall be levied, assessed, collected, and paid, in lieu of the tax imposed by section 703 of the Revenue Act of 1924, *upon the use* of yachts, pleasure boats, power boats, sailing boats, and motor boats with fixed engines, *if foreign built* and if of over five net tons and over thirty-two feet in length, not used exclusively for trade, fishing, or national defense, a special excise tax to be based on each such yacht or other boat, at rates as follows: Yachts, pleasure boats, power boats, motor boats with fixed engines, and sailing boats, of over five net tons, length over thirty-two feet and not over fifty feet, $2 for each foot; length over fifty feet, and not over one hundred feet, $4 for each foot; length over one hundred feet, $8 for each foot.

In determining the length of such yachts, pleasure boats, power boats, motor boats with fixed engines, and sailing boats, the measurement of over-all length shall govern. [Italics ours.]

The Revenue Act of 1926 was enacted by the 69th Congress.

The succeeding (70th) Congress enacted the Revenue Act of 1928 (45 Stat. L. 88) which supplanted the 1926 act. It appears from proceedings related in the Congressional Record (hereinafter stated in detail, so far as deemed pertinent to the issue here involved) that the State Department, while the bill which culminated in the Revenue Act of 1928 was pending before the Senate, made certain representations to the Congress to the effect that the imposition of taxes on the use of foreign-built boats in some manner conflicted with the 1925 treaty with Germany which was then (1928) in force. The details of the representations so made do not appear in the Congressional Record, but evidently, as the sequel shows, the representations caused the Congress to (1) repeal in its entirety section 702 of the 1926 act (this being provided by section 431 of the 1928 act) and to adopt as section 708 (1928 act) the phraseology which subsequently was used without material alteration in paragraph 370 of the Tariff Act of 1930.

The legislative history relating to paragraphs 431 and 708 of the

Revenue Act of 1928 was epitomized in our decision in the case of *H. W. Chadbourne* v. *United States*, 27 C. C. P. A. (Customs) 85, C. A. D. 66, but in view of the nature of the issue here presented, we deem it proper to now recite it in greater detail.

On May 15, 1928 (see Cong. Record, Vol. 69, Part 8, pp. 8707–8), the Senate was considering the bill which culminated in the act, and Senator Smoot, Chairman of the Committee on Finance, offered a committee amendment which was stated by the chief clerk as follows:

The committee proposes to strike out, on page 204 [of the bill], lines 3 to 14, both inclusive, and to insert:

Section 702 of the revenue act of 1926 (imposing a tax on the use of certain foreign-built boats) is repealed, to take effect July 1, 1928.

Discussion participated in by various Senators followed, the here pertinent parts of which we quote, the italics being supplied:

Mr. WALSH of Montana. Mr. President, if we adopt the amendment, what will be the *duty* on such boats?

Mr. SMOOT. There would not be any, with the exception that the matter would go into conference, and then we will decide upon it.

Mr. WALSH of Montana. Yes; but if we adopt this amendment, to what tax will these boats be subject?

Mr. SMOOT. No tax at all.

Mr. EDGE. Mr. President, right at that point, as I understand, if we adopt this amendment we are really repealing the existing law, are we not?

Mr. SMOOT. That is what it says; it repeals section 702 of the revenue act of 1926.

Mr. EDGE. All right.

Mr. SMOOT. That act taxed certain boats $2 for each foot, and $4 a foot for a 100-foot boat, and $8 a foot for boats above 100 feet.

Mr. EDGE. Then, in other words, we go to conference, should this amendment be adopted, in the position that there is absolutely no *duty* at all on foreign-built yachts.

Mr. SMOOT. That is true.

Mr. EDGE. Then, of course, it must be clearly understood, as far as my personal vote is concerned—for that is quite an industry in this country—that if this amendment is adopted, the conferees on the part of the Senate will insist on some substitute to protect this great industry as far as treaty rights will permit it.

Mr. SMOOT. I want to be perfectly frank with the Senate and tell them the situation as the committee saw it.

The rates of $10, $20, and $40, provided for in the House bill, were five times the amount of the existing rates. A question was raised by our State Department as to objections that have been raised to the House provision and to the present law.

Mr. EDGE. By the German Government?

Mr. SMOOT. By the German Government. What the committee decided was to strike this out and let it go to conference, and we will work out something there to take care of this situation in a way with which we hope all will be satisfied.

Mr. NORRIS. Mr. President, this applies only to yachts, does it, or to all kind of boats? I want to ask the Senator from Utah about that.

Mr. SMOOT. It applies to yachts, pleasure boats, power boats, motor boats with fixed engines, and sailing boats, of over 5 net tons and length over 32 feet.

Mr. EDGE. Practically to all classes.

Mr. SMOOT. Virtually to all yachts of that class.

Mr. NORRIS. If this amendment prevails, the effect of it will be to put boats on the *free list?*

Mr. SMOOT. Yes; if the House yielded.

Mr. NORRIS. I understand; but we ought to vote on it just as though it were going to become part of the law. I can not myself understand how these members of the committee, being high protectionists, would bring in an amendment here that would put us on a free-trade basis in order to satisfy a lot of fellows who want to buy some yachts.

Mr. SMOOT. No; I want to say that a great part of these boats now would be subject at once to the tariff rate of 40 [30] per cent.

Mr. NORRIS. Not if we pass this amendment. We repeal the law.

Mr. SMOOT. No; *we repeal this particular law, but we do not repeal section 370 of the tariff act at all.*

Mr. NORRIS. There is still a tariff on them?

Mr. SMOOT. Yes; on certain boats.

\* \* \* \* \* \* \*

Mr. EDGE. I may say that this does not apply alone to large yachts. It applies to all kinds of craft, as explained by the amendment, very small craft; but, not to permit the suggestion of the Senator from Nebraska to go without a word, the wisdom of the House is plainly evidenced. As the bill appears before us protection was necessary, because they raised it, as I recall, five times; and I believe the majority of the Finance Committee felt that that was a just *tax* or a just *tariff.*

Mr. NORRIS. I am not finding fault with it.

Mr. EDGE. But apparently there is a treaty condition that, in the opinion of the Department of State, interferes with the tax; and, as I understand the chairman of the committee—and this is the reason why I asked the question—it is the hope that the conferees of the two Houses will be able to prepare a section that will be within our treaty rights and still protect American shipbuilders.

Mr. NORRIS. I will say to the Senator from New Jersey that I listened to the reading of the amendment and to some of the things the Senator from Utah said, and I reached the conclusion that this repealing act referred to our tariff act. I am wrong about that, I am informed.

Mr. FLETCHER. Yes.

Mr. NORRIS. That clears it all up in my mind. I have no objection.

The PRESIDING OFFICER (Mr. Vandenberg in the chair). The question is on the amendment of the committee.

The amendment was agreed to.

It appears from the foregoing that during the discussion the terms "duty," "tax," and "tariff" may have been used interchangeably, but it is clear that at the close of the discussion there could have been no reasonable misunderstanding as to the scope of the amendment, and it must have been understood that the repeal of section 702 of the 1926 revenue act was not intended to affect paragraph 370 of the 1922 tariff act.

The subject matter did not end, however, with the adoption of the committee amendment offered by Senator Smoot. The bill was again under consideration in the Senate on May 21, 1928 (see Cong. Record

Vol. 69, Part 9, p. 9326) when the following occurred (the italics being supplied):

The VICE PRESIDENT. If there be no further amendments to be proposed, the bill will be reported to the Senate.

Mr. REED of Pennsylvania. Mr. President, before the bill goes out of the Committee of the Whole, I propose the amendment which I send to the desk.

The VICE PRESIDENT. The amendment will be stated.

The CHIEF CLERK. On page 243, after line 5, it is proposed to insert the following, as a new section:

SEC. —. Definition of the Term "Motor Boat."

The term "motor boat," *when used in the revenue laws,* includes a yacht or pleasure boat, regardless of length or tonnage, owned by a resident of the United States or brought into the United States for sale or charter to a resident thereof whether or not such yacht or boat is brought into the United States under its own power, but does not include an instrumentality of trade or commerce nor any such yacht or boat built, or for the building of which a contract was entered into, prior to December 1, 1927.

Mr. SMOOT. Mr. President, I have no objection to that amendment.

The VICE PRESIDENT. The question is on agreeing to the amendment.

Mr. McMASTER. Mr. President, I should like to inquire of the Senator from Pennsylvania if this is a tariff amendment?

Mr. REED of Pennsylvania. Mr. President, I do not know whether it can be fairly called a tariff amendment or not, but it ought to be considered by the conferees in connection with the repeal of the tax on foreign-built yachts.

There is in the House bill an annual license tax on foreign-built yachts which, because of certain complications under the treaty with Germany, was stricken out by the Finance Committee. If it is to be stricken out, and if the present decision of the Supreme Court is to stand, that a yacht which enters our waters under its own power is not an article of commerce but an instrumentality of commerce, then, the conferees ought to be free somehow to define the term "instrumentality of commerce." In that sense, I presume it is fair to call the amendment a tariff amendment, but what we are trying to do is to accomplish the end on which we all agree, to continue the tax on foreign-built yachts and still not violate the treaty with Germany.

The VICE PRESIDENT. The question is on agreeing to the amendment offered by the Senator from Pennsylvania.

The amendment was agreed to.

It is obvious from the above statement of Senator Reed that he was not prepared definitely to construe fully the terms of the amendment which he offered, or at least he did not definitely state whether the definition of "motor boat" was intended to apply only to the excise taxes in the revenue acts, or to both those and the customs duties provided in the tariff act. His motive seems primarily to have been to get language into the bill as a basis for consideration of the subject matter in the conference which it was anticipated would be had (and which was had) between representatives of the House and Senate to resolve differences between them relative to the bill.

We may assume, for the purposes of this case, that if the amendment offered by Senator Reed had been adopted in the exact form proposed it would have been construed to apply to the revenue laws, as distinguished from the tariff laws, because of the phrase "when used in

the revenue laws," appearing therein, and that the customs duties provided in the Tariff Act of 1922 would not have been affected by it; but it was not passed in that form. As enacted, the phrase "*when used in the Act of September 21, 1922*" [italics ours] was substituted for the phrase "when used in the revenue laws." The Act of September 21, 1922, so referred to, obviously, was the Tariff Act of 1922. So, it is not possible to escape the conclusion that the Congress to the extent indicated by the phraseology of paragraph 708 of the Revenue Act of 1928 did modify the Tariff Act of 1922.

Furthermore, when the provision appeared as paragraph 370 in the Tariff Act of 1930 the language "when used in the Act of September 21, 1922" was changed to read "*when used in this Act.*" [Italics ours.] It is clear, therefore, that the definition was intended to be applicable in the assessment of customs duties.

The question, in the final analysis, seems to be whether it was the intention of Congress to render motor boats such as that here involved subject to the rule relative to customs duties announced by the Supreme Court in the *Conqueror* case, *supra*, and thus render them free of all taxes (there being no tonnage tax) and duties, which is the effect of the trial court's decision.

We think it evident from the discussions above-quoted from the Senate proceedings that it was not the desire to render motor boats of the *Francis* type free of duty if that could be avoided in a manner consistent with our treaty obligations. It would probably be helpful in construing the different paragraphs of the 1930 act here involved, if we had before us the definite representations which were made to the Congress by the State Department so that it might be known just what type of taxes or duties were complained of by Germany, but, so far as we are advised, such specific representations are not available.

So far as the discussions in the Senate show, it might be deduced that the protest was directed to only the taxes on the use of foreign-built boats as levied in the revenue laws, but from the fact that changes were finally provided in the tariff laws as well, we are compelled to conclude that customs duties were also at issue and that the situation was met, first, as to the use tax, by repealing section 702 of the Revenue Act of 1926, and, second, as to the tariff duties, by excluding certain vessels from the definition of "motor boat." If our conclusion in this regard be correct, it obviously cannot logically be held that while excluding them from paragraph 370, it was the intent of Congress to leave them dutiable at an even higher rate under paragraph 412, and any administrative action (whatever the administrative history may be) classifying them under paragraph 412 or otherwise levying customs duties upon them must be voided.

We are, therefore, constrained to agree with the conclusion of the trial court.

Our decision, of course, is based solely on the facts of the case before us, but we deem it not improper to indulge in *dictum* to the extent of saying that, so far as we can see, imported motor boats of the type here involved built, or for the building of which contract was entered into subsequent to December 1, 1927, would be subject to the duty fixed in paragraph 370 of the Tariff Act of 1930 (as modified by the Canadian Trade Agreement), so long as that act is in effect, that paragraph being more specific than paragraph 412.

The judgment appealed from is *affirmed.*