## ISTHMIAN STEAMSHIP CO. v. JARKA CORP. OF BALTIMORE.

## THE CAPE FRIENDSHIP.

No. 3255.

United States District Court
Maryland Admiralty Division.
Oct. 25, 1951.

Ober, Grimes & Stinson, Baltimore, Md., Wm. A. Grimes, Baltimore, Md., Kirlin, Campbell & Keating, New York City, for libellant.

Clark, Thomsen & Smith, Baltimore, Md., J. Gilbert Prendergast, Baltimore, Md., for Respondent.

CHESNUT, District Judge.

On June 30, 1947 two propeller blades of the steamship Cape Friendship, owned by the Maritime Commission but demised to the Isthmian Steamship Company, were damaged by a steel barge operated by the Jarka Corporation of Baltimore, which was engaged in unloading the contents of the barge to the ship. The ship was a cargo ship about 400 feet long and of 6711 gross tons lying alongside a Canton pier in the Baltimore Harbor for loading. The libel to recover the damage was not filed by the Isthmian Steamship Company until nearly three years thereafter, on June 23, 1950. The question of liability for the damage was heard and decided on February 20, 1951 and an interlocutory decree in favor of the libellant was filed on February 27, 1951. An oral opinion finding the facts was rendered at the time and has been transcribed. Damages in the amount of about $15,000 were claimed by the libellant when the suit was filed. After much negotiation the parties were unable to agree upon the amount of the damages and that question has now been further heard on evidence, chiefly by depositions on behalf of the libellant, and by oral testimony of witnesses in court for the respondent. After considering the evidence I am satisfied that the amount of damages claimed by the libellant is excessive. I conclude that the proper amount to be allowed is $5,570.08, with interest at 4% from the date of institution of the suit, June 23, 1950. Interest should not be computed from an earlier date by reason of the long delay in instituting the suit. Without reviewing the evidence in detail I will state the principal facts and reasons which have led me to the conclusion as to the amount to be allowed.

The damage to the propeller blades consisted only in the blunting or turning of the trailing edges of two adjacent blades of the four blades of the propeller. At the time when the steel barge was negligently allowed to come into contact with the propeller it was being very slowly turned by the engines, for testing purposes, counter-clockwise in a jerky manner, in consequence of which a blade of the propeller turned only about 2 degrees of the circle at a time. The propeller was made of bronze, a somewhat softer metal than steel. Only a small portion of each of the two damaged blades was affected, one 15 inches in length by 5 inches of turning from the edge, and the other similarly 18 inches by 3 inches. At the time of the immediate impact the propeller blades were under water and the extent of the actual damage was not discovered until the next

morning when the blades were out of water. Immediately the damage was surveyed by a competent surveyor acting on behalf of the underwriters for the owner, and it was determined that the ship was not unseaworthy but could proceed on her voyage and have the necessary repairs made later. The repairs could immediately have been made at the Maryland Dry Dock Company in Baltimore Harbor which would, I find, have caused a delay of about 48 hours only; but as the ship had been partially loaded the master decided to proceed at once on her contemplated voyage to Honolulu and to have the necessary repairs made upon her return to the United States.

The type of damage to propeller blades here involved seems to be not infrequent in busy ports. On January 20, 1947, about six months prior to the accident in this case, the ship had sustained a very similar accident to her propeller blades while coming into contact with a scow in the Harbor of Brooklyn, New York. This damage was not repaired until the ship came to Baltimore in June 1947, where she was dry-docked at the Maryland Dry Dock Company in the Baltimore Harbor and the propellers were repaired by "fairing" for an agreed price of $826. The same surveyor (Mitchell) who had acted for the underwriters of the owner in the survey of the ship at Baltimore just prior to the fairing of her propeller blades at the Maryland Dry Dock Company, also estimated the probable cost of similar repairs due to the accident of June 30, 1947, in Baltimore at about $400. Another Baltimore surveyor who did not survey the ship at the time but from his stated qualifications was, I find, thoroughly competent to express an expert opinion, testified that in his opinion if the repairs due to the accident of June 30, 1947, had been at once made here in Baltimore at the Maryland Dry Dock Company, the reasonable cost thereof, including the towage of the loaded ship from the pier where the accident occurred to the Maryland Dry Dock Company, and towing the ship back to her pier, with all incidental items included, would have been $2726, exclusive of repainting the hull with anti-fouling paint, which item if to be allowed for could reasonably have been done for $1,000; and that the time required for towing, dry docking, repairs and transfer of the ship back to her pier would have been only about 48 hours.

The ship made its voyage to Honolulu apparently without incident other than the statement by two of the ship's officers, by deposition, that considerable vibration had been noted during the voyage which, it appears, was caused by the "wiping" of a high speed pinion bearing. In due course the ship returned to the United States, was unladen at Philadelphia and arrived in New York on September 19, 1947. A marine surveyor (Chambers), engaged by the ship owners, as a result of his survey of the propeller at that time, and reports made to him as to the accident on June 30, 1947 in the Baltimore Harbor, and further reports as to the vibration experienced on the voyage to Honolulu, determined that the tail shaft should be drawn for shock examination of the keyway, and the propeller removed from the ship and sent to a foundry at Hoboken for fairing. The ship was put in dry dock and delayed thereby for a period of six days, from September 22 to September 28. At that time the Isthmian Steamship Company was operating a fleet of about 60 ships and had need for the Cape Friendship to load and sail with cargo on September 20; but while the ship was enroute returning from Honolulu it became evident that she would not be available for sailing on September 20. The sailing schedule of other ships was then re-arranged and the cargo intended for the Cape Friendship on September 20 was laden on them. By reason of delayed delivery of other cargo intended for the Cape Friendship she was unable to sail until October 15, 1947.

On July 22, 1948 the Isthmian Steamship Company wrote to the Jarka Corporation (the respondent in this case) asking it to reimburse the Steamship Company for damages due to the collision accident of June 30, 1947 in Baltimore. The amount of these expenses was itemized in the total amount of $6,353.38, of which $5,675 was

the charge made by the Todd Shipyards Corporation (of New York) for repairs. Other items of comparatively much smaller amounts were for surveys, pilotage, towing and watching, the latter inferably for watchmen employed while the Cape Friendship was in dry dock in New York for six days.

The claim still being unsettled on March 2, 1950, nearly three years after the collision damage in Baltimore for which claim had been made, admiralty lawyers for the Isthmian Line wrote to the Jarka Corporation with respect to the propeller damage occuring on June 30, 1947, in which they invited the defendant to confer about the matter before litigation, and in which they said: "On the instructions of Isthmian Steamship Company, we have made a thorough investigation of the events which led up to the propeller damage suffered by the Cape Friendship, and both we and the Isthmian Steamship Company feel satisfied that the responsibility lies solely with Jarka. Isthmian has suffered damages of upward of $6,000 in making good the steamer's propeller repairs." In the ensuing libel the amount of the claim for damages was apparently for the first time stated to be about $15,000.

In a carefully prepared brief for the recent hearing in this court on the amount of damages, proctors for the Steamship Company have listed 21 separate items of damage aggregating $16,322.12. Opposite each item is placed an exhibit number in purported support thereof. For convenience in consideration counsel have agreed that the 21 items may be divided into three classes consisting of (1) expenses of repairing the propeller; (2) damages for detention of the ship for the six days she was in dry dock at New York, September 22 to September 28, 1947, and (3) damages due to vibration of the ship on the voyage from Baltimore to Honolulu.

The amount claimed for the third item, vibration damage, is about $1700. I do not allow it at all. It is claimed that the vibration on the ship's voyage to Honolulu was due to the blunting of the edge of two adjacent propeller blades and that this caused a slackening of speed during the voyage, thus prolonging it for a day. It is also claimed that the vibration damaged a high speed pinion in the shaft assembly connecting with the propeller. But the evidence in the case does not satisfy me that the damage to the propeller was the proximate cause of the damage to the pinion. Perhaps even more importantly, it is my opinion that the necessary repairs to the propeller could and should have been promptly made at Baltimore before the ship sailed for Honolulu, in which event the repairs to the propeller should have obviated the vibration and the alleged consequent damage to the pinion. It is clearly the duty of a party injured by the tort of another to take reasonable steps to minimize the amount of the damage.

The chief item in the category of expense for repairs was the Todd Shipyards bill of $5,675 for fairing the propeller. The estimate of the witness Stein, testifying for the respondent in Baltimore above referred to, was that if the work had been done at the Maryland Dry Dock in Baltimore the expense would have been only $2726. I am satisfied from Mr. Stein's orally given evidence that his estimate was sound and reasonable. The much greater expense bill of the Todd Shipyards in New York may then have been due to conditions there prevailing in the latter part of September which would not have been encountered if the work had been done early in July in Baltimore. The Todd bill included the sending of the propeller to a foundry in Hoboken. This was determined to be necessary or at least advisable by the surveyor Chambers testifying for the libellant by deposition. His conclusion was based not only on the reports which he had received from the survey of the propeller made in Baltimore on July 1, 1947, but also on reports that he had received particularly with respect to vibration damage thereafter on the voyage to Honolulu. It appears from his deposition and the arguments of counsel for the libellant that it was this factor of vibration damage which largely explained the considerable difference of opinion between the Baltimore and New York surveyors. For the reasons already indicated, I do not

think the vibration damage should be considered sufficient to justify the much larger expense bill for repairs incurred in New York three months after the accident in Baltimore.

The amount of damages claimed for detention or delay of the ship for six days while in dry dock in New York is about $7,000. No claim for this large item was made either in the letter written in 1948 from the office of the libellant to the respondent, nor in the claim as asserted in the letter from admiralty counsel in 1950 prior to the institution of the suit. In explanation it is said for the libellant that the itemized claim of about $6,000 as first made in 1948 and again two years later in 1950, consisted only of items of damage which were recoverable against underwriters; but it also appears from the examination of the libellant's officer who made the 1948 demand that if the expense bill of $6,353.38 had then been paid or assented to by Jarka, no further claim for damages would have been made.

However, if we put aside this belated aspect of the claim for detention I do not think it is allowable for six days nor for most of the items now included in it. In the first place it is to be noted that if the repairs had been made in Baltimore immediately after the accident the work could have been done in two days. The fact that it took six days in New York was probably due to the particular congested situation then and there existing, which would have been avoided in Baltimore.

It is clear in the admiralty law that damages are recoverable for the unavoidable delay of a ship proximately caused by collision. The principle involved in determining the amount to be allowed for such damage is not materially different from other cases of negligent damage to useful property, as, for instance, to an automobile; but an examination of numerous illustrative cases shows that there is no one certain method for determining the amount applicable to varying situations. It can be said that the proper objective in all cases is to determine what actual loss was sustained by the ship owner. Primarily this is to be determined by ascertaining what earnings or net profits the ship has lost by the delay. But in many cases it is difficult, if not impossible, to calculate the damages in that way although the real existence of damage is undeniable. Where the ship owner has but a single ship the problem is generally much simpler than when, as in the instant case, the ship owner was operating a fleet of 60 or more ships and where the sailing schedule for several ships can be re-arranged to take care of an immediate situation.

Where the loss of profits is put forth as the measure of damages, it is generally held that merely speculative profits cannot be recovered. But where detention damage is clearly shown, though satisfactory proof of definite loss of profits is not available, other methods of determining the damage have been allowed, as, for instance, in some cases detention damage has been calculated on the basis of the charter hire which the owner is currently obligated to pay, or the reasonable cost of chartering a substituted ship of the same kind, and in some cases the wages and maintenance of the crew during the detention period have been allowed. Of course the burden of proving damages in all cases rests upon the party claiming to have sustained them, and it is the duty of the ship owner to take all reasonable actions to minimize the damages. Illustrative cases are, The Baltimore, 8 Wall. 377, 19 L.Ed. 463; The Conqueror, 166 U.S. 110, 125, 17 S.Ct. 510, 41 L.Ed. 937; Brooklyn Eastern District Terminal v. United States, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240; The Orion, 4 Cir., 239 F. 301; Zeller Marine Corp. v. Nessa Corp., 2 Cir., 166 F.2d 32; Clyde S.S. Co. v. City of New York, 2 Cir., 20 F.2d 381; Pan-American Pet. & Trans. Co. v. United States, 2 Cir., 27 F.2d 684–686; Navigazione Libera Triestina Societa Anonima v. Newtown Creek Towing Co., 2 Cir., 98 F.2d 694, 698; Hawaiian-Larchgrove, 1935 A.M.C. 809; Carolinian-San Clemente, 1943 A.M.C. 758; Del-Mar-Va—L.S.T. 389, 1945 A.M.C. 1332; Pocahontas S.S. Co. v. M/V Detroiter, etc., 1948 A.M.C. 349; Sinclair Ref. Co. v. Sun Oil Co., 2 Cir., 188 F.2d 64, 1951 A.M.C. 845; The Mascot, 3 Cir., 282 F.

766, 771; Robinson on Admiralty, pp. 848-851.

After consideration of the evidence and applicable rules for the computation of damages in the instant case, I conclude that the aggregate of the allowable items of damage is $5,570.08, with interest thereon at 4% from June 23, 1950, the date of institution of the suit. The items included in this total are as follows:

| | | |
|---|---|---|
| 1. | Repairs to propeller (as estimated by Stein) | $2726.00 |
| 2. | Estimated reasonable cost of anti-fouling paint | 1000.00 |
| 3. | Fees of survey at Baltimore | 35.75 |
| 4. | Pro rata charter hire for 2 days | 808.33 |
| 5. | Wages and maintenance of crew for 2 days | 1000.00 |

I will comment briefly on the allowances and as to some items claimed but disallowed.

1. As to the amount allowed for repairing the propeller, I have accepted the estimate of the witness Stein rather than the much larger expense bill of the Todd Shipyards, for the reasons above indicated.

2. As to the item of anti-fouling paint, the libellant claims $1527.50 for labor and materials. This repainting of the ship's bottom was done at New York three months after the accident at Baltimore. Anti-fouling painting had just previously been done when the ship's propeller was repaired at the Maryland Dry Dock Company in Baltimore. Ordinarily such painting is done only when the ship is dry-docked about once in nine months. The allowance of $1,000 which I have made is in accordance with the estimate of a reasonable amount therefor made by the witness Stein and is on the assumption that the ship should have been dry-docked again in Baltimore and the repairs made there promptly after the damage to the propeller. It may seem surprising that the ship's bottom should need re-painting twice within a week but the explanation seems to be that if a ship is dry-docked and the bottom exposed to the air for more than 24 hours the nature of the anti-fouling paint is such that its effect is destroyed when out of water. The matter is discussed by Circuit Judge Learned Hand in Navigazione, etc., v. Newtown Creek Towing Co., 2 Cir., 98 F.2d 694, 698, where it was said: "Ships are painted with a substance which prevents fouling unless it is exposed to the air; an exposure of 24 hours will destroy its virtue. Hence it is the custom of shipyards to paint the bottom whenever a ship is dry docked." There is also evidence to the same effect in the instant case. I therefore allow this item.

3. The libellant claims reimbursement for surveyors' fees at Baltimore and New York and Honolulu. I allow the item for Baltimore but disallow it for New York and Honolulu.

4 and 5. As to detention damages, I allow the pro rata charter hire of the ship for the two days' delay that would have resulted if the propeller repairs had been made at Baltimore, and also for the wages and maintenance of the crew for that period. The respective allowances for these two items are taken pro rata from the figures submitted by the libellant for the longer six day period when the ship was dry-docked at New York in September. In the absence of evidence as to what the ship's earnings would have been for this two-day period, resort must be made to a different method of calculating the loss sustained. The ship was under charter hire from the Government at the rate of $12,125 per month. The services of her crew could not reasonably have been dispensed with during a short period of two days. The repairs should have been made at Baltimore but it is clear enough that there would have been a two-day delay in making them, during which these expenses on the ship would have accrued. In other comparable situations allowances have been made on the basis of charter hire and wages and maintenance of the crew. Hawaiian—Larchgrove, D.C.S.D.N.Y., 1935 A.M.C. 809, 820; Del-Mar-Va—L.S.T. 389, 1945 A.M.C. 1332 (D.C.Va.). The libellant also claims other items of detention damage including $387.95 for consumption of fuel and other ship supplies during the six-day detention at New York. I find no evi-

dence as to what amount of supplies would have been consumed in two days at Baltimore. A larger item claimed is for the accrual of insurance premiums on the ship during the detention period. In my opinion such an item is not properly allowable as a factor in computing detention damage, at least under the circumstances of this case. A similar claim has been disallowed in other cases. In Sinclair Ref. Co. v. The American Sun, 2 Cir., 188 F.2d 64, 67, 1951 A.M.C. 845, 849, it was said by Circuit Judge Chase: "The question as to the disallowance by the court as recoverable damages of the premiums paid for insurance on the 'Hurley' during the detention cannot forseeably recur on the remand. They were, however, correctly disallowed. The Baltimore Maru, 5 Cir., 11 F.2d 836 [1926 AM.C. 575]; The Tremont, 9 Cir., 161 F. 1."

Counsel may submit the approporiate decree in due course.